IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Peck, et. al, | No. CV-12-01371-PHX-JAT |
| Plaintiffs, | **ORDER** |
| vs. | |
| Margaret Hinchey, et. al, | |
| Defendants. | |

Pending before the Court is defendant Margaret Hinchey's Motion to Dismiss (Doc. 197) the claims against her in Plaintiffs' Second Amended Complaint ("SAC") (Doc. 180) pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  Also pending is Hinchey's Motion for Summary Judgment on Qualified Immunity Grounds (Doc. 213) and Plaintiffs' Cross-Motion for Partial Summary Judgment against Hinchey on Counts I and II of the SAC (Doc. 291).

Additionally pending is defendants Paula Veach and City of Phoenix's[1] Motion for Summary Judgment Regarding Immunity (Doc. 257) and Plaintiffs' Cross-Motion for Partial Summary Judgment against Veach on Counts I and II of the SAC (Doc. 293).

The five motions are fully briefed and the Court heard oral argument on March 6, 2014.  The Court now rules on the five motions.

---

[1] Jack Harris is also named as a movant, however, pursuant to stipulation by the parties, Mr. Harris has been dismissed as a defendant in this case.  (Doc. 269).

1   I.      **BACKGROUND**[2]

2          In 2005, the Cotton Center Townhomes Properties ("Townhomes") contracted

3   with former Phoenix Police Department ("PPD") Officer George Contreras to provide the

4   Townhomes with uniformed off-duty PPD services.   (Separate Statement of Facts in

5   Support of Plaintiffs' Motion for Summary Judgment for Counts I and II Against

6   Defendant Paula Veach ("PSOF"), Doc. 295 ¶¶ 1–4; Defendant Paula Veach's

7   Controverting Statement of Facts Opposing Plaintiffs' Motion for Summary Judgment

8   Regarding Counts I and II ("DCSOF"), Doc. 321 ¶¶ 1–4).   Contreras negotiated the terms

9   of the Townhomes job, which included that the officers' shifts would begin and end at the

10  South Mountain Precinct and that, in order to avoid paying overtime, officers could

11  "flex" time they worked beyond a scheduled shift to a subsequent shift.   (PSOF ¶¶ 4, 9–

12  13, 25–27, 33–34).   Neither of these terms were prohibited by the relevant PPD off-duty

13  policies.   (PSOF ¶¶ 12, 24, 34).

14         Contreras selected more than fifty PPD officers to work this off-duty job,

15  including Plaintiffs Steven Peck, Aaron Lentz,[3] and Benjamin Sywarungsymun

16  ("Plaintiffs").   (PSOF ¶ 1).   The Townhomes officers worked in two-man shifts and used

17  a patrol car that was picked-up and dropped-off at the PPD South Mountain Precinct.

18  (PSOF ¶¶ 21–27).   Contreras kept a handwritten logbook at the South Mountain Precinct

19  to allow officers to log their activities and communicate relevant information to

20  subsequent shifts.   (PSOF ¶¶ 35–37).

21         Contreras did not monitor or verify the times that the officers began and ended

22

23         [2] This section contains general background information to provide context for the
24  Court's analysis and not any factual findings of the Court.   This is because this order
    resolves motions that require three conflicting interpretations of the allegations and
    evidence proffered by the parties.   First, for purposes of Hinchey's motion to dismiss, the
25  facts from Plaintiffs' SAC are taken as true.   *See Shwarz v. United States*, 234 F.3d 428,
    435 (9th Cir. 2000).   Second, for purposes of Defendants' motions for summary
26  judgment, the Court construes all disputed facts in the light most favorable to Plaintiffs.
    *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).   Third, for purposes of
27  Plaintiffs' cross-motions for partial summary judgment, the Court construes all disputed
    facts in the light most favorable to Defendants.   *Id.*
28
           [3] Plaintiff Sharon Lentz is the wife of Plaintiff Aaron Lentz.

their shifts.  However, the patrol cars used by the officers included an on-board computer ("MDT") that recorded officers' sign-in/sign-off times.  (PSOF ¶ 47; Controverting Statement of Facts to Defendants City of Phoenix and Paula Veach's Separate Statement of Facts in Support of Her Motion for Summary Judgment on Immunity Grounds ("PCSOF"), Doc. 297 ¶ 5).  Although the MDT's sign-in/sign-off system could be unreliable, the officers often used the MDT.  (PSOF ¶ 55–59; *see* PCSOF ¶ 5).  Additionally, the officers used radios that recorded on/off times.  (PSOF ¶ 52; *see* PCSOF ¶ 5).  PPD off-duty policies, however, did not require the officers to sign-in with the MDT at the beginning of their shifts, or to sign-off the MDT or the radio at the end of their shifts.  (PSOF ¶¶ 48–52).

In October, 2006, the Townhomes job ended.  (PSOF ¶ 68).  On December 7, 2006, in response to a citizen complaint that the Townhomes officers had been paid for services not actually performed, PPD assigned two detectives from its Professional Standards Bureau to audit the Townhomes job.  (Defendants City of Phoenix, Paula Veach and Jack Harris's Statement of Facts in Support of Motion for Summary Judgment Regarding Immunity ("DSOF"), Doc. 258 ¶¶ 1–4; PCSOF ¶¶ 1–4).  The detectives gathered documentation including pay slips, department reports from arrests made at the Townhomes, sign-in/sign-off data from the MDTs, radio on/off times, and various written logs.  (PCSOF ¶ 5).  The detectives organized this information into an Excel spreadsheet (the "PSB spreadsheet") and the preliminary data indicated discrepancies between the hours officers worked and the hours they were paid.  (PCSOF ¶¶ 6–7).

PPD transferred the matter to Sergeant Paula Veach to conduct an administrative investigation to determine if any PPD policies had been violated.  (PCSOF ¶¶ 8–10).  Veach received the PSB spreadsheet, requested additional materials, and added additional information to the PSB spreadsheet.  (PCSOF ¶¶ 11–12).  Veach also conducted seven *Garrity*-protected officer interviews, including of Contreras and Plaintiff Sywarungsymun.  (PCSOF ¶¶ 14–16).

After two of the interviewed officers admitted to leaving the Townhomes job

early, Veach was ordered to create a PowerPoint presentation to show the current status of her ongoing administrative investigation to her chain of command.  (PCSOF ¶¶ 17–18).  Following the presentation, Veach was ordered to halt her administrative investigation and PPD referred the matter to the Arizona Attorney General's Office ("AGO") for an independent criminal investigation.  (PCSOF ¶¶ 19–20).  Veach was ordered to provide her records to the AGO and serve as PPD's liaison for the purposes of the AGO's criminal investigation.  (PCSOF ¶ 20).

In November 2008, the AGO appointed Special Agent Margaret Hinchey to conduct a criminal investigation into the matter and Hinchey contacted Veach.  (PCSOF ¶ 21).  Veach met with Hinchey to discuss the PSB spreadsheet and its underlying data.  (DCSOF ¶ 21).  Veach informed Hinchey that Veach's administrative investigation was incomplete and that the PSB spreadsheet was incomplete and inaccurate.  (PCSOF ¶¶ 22, 99–100).  During the course of Hinchey's investigation, Veach, as the PPD liaison, answered Hinchey's questions related to PPD policies and procedures and directed Hinchey to sources of data relevant to Hinchey's investigation.  (PCSOF ¶ 34).  In December 2009, Veach was transferred out of the PSB unit and her role as PPD liaison to Hinchey ended.  (PCSOF ¶ 23).

During Hinchey's investigation, Hinchey "asked PPD for all supporting data used to calculate times in the PSB spreadsheet" (PSOF ¶ 108), determined shift start and end times using "MDT, radio log off, PACE time, [and] report entry times" (PSOF at Ex. 18 pp. 55–57), reinterviewed a Townhomes witness (PSOF ¶ 112, Ex. 44), and interviewed at least 21 Townhomes officers (PSOF at Exs. 19–20, 23–41).  As part of her investigation, Hinchey heavily modified the PSB spreadsheet.  (*Id.*; *see also* SSOF at Exs. 17, 58–60).  During her investigation, Hinchey authored numerous investigative reports (DSOF at Ex. 12) and informed her supervisors of the status of her investigation.  Plaintiffs allege that Hinchey's reports failed to include exculpatory evidence and included false or fabricated evidence intended to mislead the prosecutor into pursuing criminal charges against Plaintiffs.  (SAC ¶¶ 232–37).

Plaintiffs allege that the decision to indict Plaintiffs was made in the fall of 2010. (SAC ¶ 241).   Specifically, Plaintiffs allege that, in order to achieve political gain, Attorney General Terry Goddard directed that Hinchey's investigation conclude and the prosecutor procure indictments prior to Election Day on November 2.  (SAC ¶¶ 244–47). Plaintiffs further allege that in response, Hinchey presented false, misleading, and fabricated results from her investigation to the prosecutor, Todd Lawson, for the purposes of supporting criminal charges against Plaintiffs.  (SAC ¶¶ 251–54, 260–61).  Plaintiffs allege that Lawson convened a grand jury and Hinchey, as the sole witness to the grand jury, perjuriously presented false evidence to secure an indictment against Plaintiffs. (SAC ¶¶ 255–57).  The grand jury returned an indictment of Plaintiffs on November 17, 2010.  (SAC ¶ 258).  Plaintiffs allege that there was no probable cause for the indictment. (SAC ¶ 259).   Plaintiffs further allege that Hinchey continued the investigation and continued to submit false, fabricated, and misleading reports to her supervisors and Lawson.  (SAC ¶ 268).

During the course of criminal discovery, Plaintiffs' attorneys reviewed Hinchey's investigation, discovered falsities, and moved for remand of Plaintiffs' indictment. (SAC ¶¶ 278–80).  Remand was granted and a second grand jury was empanelled, but the second grand jury failed to return an indictment of Plaintiffs.  (SAC ¶ 281–84).  Plaintiffs allege that without the false evidence, the second grand jury could not find probable cause.  (SAC ¶ 283).   On November 23, 2011, all criminal charges against Plaintiffs were dropped.  (SAC ¶ 286).

## II.   HINCHEY'S MOTION TO DISMISS (Doc. 197)

Plaintiffs' SAC (Doc. 180) contains eight claims against Hinchey: Counts I, II, III, V, VI, VII, IX, and XIII.  Pursuant to Federal Rules of Civil Procedure 12 (b), 12(b)(1), and 12(b)(6), Hinchey moves to dismiss all eight of the claims.  (Doc. 197).  Hinchey argues that the Court does not have subject-matter jurisdiction over at least Counts III and XIII.   (*Id.* at 4–6).   Hinchey also argues that each of Plaintiffs' claims based on 42 U.S.C. § 1983 ("§ 1983") (Counts I, II, III, V, VI, and XIII) fails to state a claim upon

which relief can be granted.  (*Id.* at 3–4, 6–11).  Hinchey additionally argues that Counts III, VI, and XIII fail to state a claim.  (*Id.* at 10–14).  Finally, Hinchey argues that each of Plaintiffs' Arizona state law claims (Counts III, VII, IX, and XIII) must be dismissed because Plaintiffs failed to exhaust non-judicial remedies by failing to comply with the Arizona Notice of Claims Statute.

### A.    Rule 12(b)(1)—the Court's Subject-Matter Jurisdiction

#### 1.    Legal Standard

A party may file a motion asserting a lack of jurisdiction over the subject matter under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(1).  A court may raise the question of subject matter jurisdiction *sua sponte* at any time during the pendency of the action, even on appeal.  *United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003); *see also* Fed. R. Civ. P. 12(h)(3).

Rule 12(b)(1) jurisdictional attacks may be facial or factual.  A facial attack inquires whether the relevant pleading contains sufficient allegations to invoke the jurisdiction of a federal court.  A factual attack relies on extrinsic evidence beyond the pleadings to assert lack of jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

#### 2.    Analysis

Hinchey argues that the Court does not have subject-matter jurisdiction over at least Counts III and XIII because Plaintiffs cannot assert § 1983 claims against Hinchey in her "official capacity."  (*Id.* at 4–6).  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Mich. Dept. of State Police*, 41 U.S. 58, 71 (1989) (citations omitted).  Because the Eleventh Amendment to the Constitution of the United States protects States from suits seeking money damages for constitutional torts, *id.* at 70; *see Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995), the Court lacks subject-matter jurisdiction over Hinchey in her "official capacity."  Indeed, Plaintiff concedes this point: the "official-

capacity 1983-claim against Defendant Hinchey must be dismissed pursuant to the Eleventh Amendment." (Doc. 217 at 4). Consequently, the Court must dismiss each of the SAC's § 1983 claims against Hinchey in her official capacity.

Although the parties agree that such claims must be dismissed, they do not agree on which of the SAC's six § 1983 claims (Counts I, II, III, V, VI, and XIII) are claims against Hinchey in her official capacity. Plaintiffs argue (Doc. 217 at 4) that only Count III should be dismissed and Hinchey argues (Doc. 197 at 4–6) that Counts III and XIII must, and Counts I, II, and V should, be dismissed.[4] Here, paragraph eight of the SAC states that "Defendant Hinchey is sued both individually and in her official capacity." (SAC ¶ 8). Each of the six § 1983 claims in the SAC "specifically" realleges and incorporates by reference Paragraph 8. (SAC ¶¶ 309, 321, 333, 357, 371, 440). However, in the headings for four of the six claims (Counts I, II, V, and VI), Plaintiffs parenthetically modify "Defendant Hinchey" with "(Individually/In her Personal Capacity)." (SAC at 35, 36, 40, 42). This is in contrast to Counts III and XIII, whose headings include no modification of "Defendant Hinchey" and Count VII (a state law claim) which modifies "Defendant Hinchey" with "(individually and in her official capacity)." (SAC at 37, 44, 51). Consequently, the Court construes Counts III and XIII as being brought against Hinchey in both her personal and official capacities, but Counts I, II, V, and VI as solely "individual capacity" claims.

The Parties also disagree as to the extent each of the "official capacity" claims must be dismissed. Plaintiffs argue that the "personal capacity" component of the Counts should be preserved and only the "official capacity" component should be dismissed. (Doc. 217 at 4). Hinchey counters, however, that pursuant to *Butler v. Elle*, Plaintiffs' impermissible pleading requires the Court to dismiss the entire Count (both "personal" and "official"). (Doc. 197 at 5 ("Plaintiffs who assert claims against a State actors [sic] in 'both their personal and official capacities'—as the Plaintiffs here have done—must

---

[4] Notably, in their briefs, Plaintiffs only reference Count III and Hinchey does not reference Count VI. (*See* Doc. 217 at 4; Doc. 197 at 4–6).

1   face the consequences of their erroneous pleadings.") (citing *Butler v. Elle*,

2   281 F.3d 1014, 1023 n. 8 (9th Cir. 2002)).

3        *Butler*, however, does not have the punitive import Hinchey describes.  In *Butler*,

4   a Plaintiff pleaded § 1983 claims against Elle, a State of Idaho employee, in both Elle's

5   personal and official capacities.  *Butler*, 281 F.3d at 1021, 1023.  The Ninth Circuit Court

6   of Appeals held that the Eleventh Amendment barred Plaintiffs' § 1983 claims brought

7   against Elle in his "official" capacity, *id.* at 1023 n. 8, but nowhere stated that the entirety

8   of the § 1983 claims against Elle were accordingly dismissed.  Rather, the Court of

9   Appeals proceeded to analyze the merits of the claims against Elle.  *Id.* at 1023–26.  This

10  strongly implies that the Court of Appeals bifurcated Plaintiffs' Section 1983 claims into

11  alternative "personal" and "official" components and only dismissed the latter.

12  Moreover, such an interpretation of *Butler* accords with other Ninth Circuit opinions on

13  the issue.  *See Ashker v. Cal. Dept. of Corr.*, 112 F.3d 392, 94–95 (9th Cir. 1997)

14  (construing a *pro per* and *in forma pauperis* plaintiff's allegation that "[e]ach defendant

15  and all of them are being sued individually and in his/her official capacity" as a personal

16  capacity suit, holding that the Eleventh Amendment does not bar the suit, and reiterating

17  that "to the extent that an alternative claim was asserted against the defendants in their

18  official capacities, that claim is, of course, barred.").[5]

19       Accordingly, the Court dismisses the "official capacity" claims against Hinchey in

20  Counts III and XIII.  Counts III and XIII, however, are not dismissed insofar as they

21  alternatively allege "personal capacity" claims against Hinchey.  Additionally, to the

22  extent that Counts I, II, V, and VI assert an alternative claim against Hinchey in her

23  official capacities, those claims are, of course, barred.

---

25     [5] Hinchey argues (Doc. 197 at 5 n. 4) that the Court should hold Plaintiffs'
26  pleadings, which were written by counsel, to a higher standard than those of the *pro per*
plaintiff in *Ashker*.  Hinchey, however, fails to show prejudice or confusion engendered
27  by Plaintiffs' unartful allegation that Hinchey was being sued in both her personal and
official capacities.  Moreover, the remainder of Hinchey's motion to dismiss and
28  subsequent Motion for Summary Judgment on Qualified Immunity Grounds (Doc. 213)
indicate that Hinchey understood that Plaintiffs' claims were likely to be construed as
suing Hinchey in her personal capacity.

**B.      Rule 12(b)(6)—Failure to State a Claim Upon Which Relief Can Be Granted**

### 1.      Legal Standard

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it fails to state a cognizable legal theory or fails to allege sufficient facts under a cognizable legal theory.  *Balistreri v. Pac. Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To survive a motion to dismiss, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief" such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

But although a complaint "does not need detailed factual allegations," a plaintiff must "raise a right to relief above the speculative level."  *Id.*  This requires more than merely "a formulaic recitation of the elements of a cause of action."  *Id.*  A complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Facial plausibility requires the plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In reviewing a complaint for failure to state a claim, the Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party."  *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  However, the Court does not have to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Id.*

1

## 2.    Analysis[6]

2    Hinchey argues that Plaintiffs' claims fail to state a claim because Hinchey is

3    entitled to absolute immunity from suit.  (Doc. 197 at 6–9).  Hinchey also generally

4    argues that each of Plaintiffs' § 1983 claims (Counts I, II, III, V, VI, and XIII) are

5    insufficiently pleaded under *Twombly* and *Iqbal*, and, therefore, fail to state a claim.

6    (*Id.* at 3–4).  Additionally, Hinchey specifically argues that Counts III, VI, and XIII fail

7    to state a claim.  (*Id.* at 10–14).

### a.    Absolute Immunity

9    Relying on a recent decision by the Supreme Court of the United States, *Rehberg*

10    *v. Paulk*, -- U.S. --, 132 S. Ct. 1497 (2012) (holding that a grand jury witness is entitled to

11    the same immunity as a trial witness in actions under § 1983), Hinchey argues

12    (Doc. 197 at 6–9; Doc. 247 at 7–9) that because Plaintiffs' claims in the SAC are

13    predicated on Hinchey's grand jury testimony, Hinchey is absolutely immune for suit.

14    Plaintiffs respond (Doc. 217 at 4–10) that the claims in the SAC are actually based on

15    Hinchey's "presentation of false evidence to the prosecutors, without regard to the

16    presentation of evidence to the grand jury" (*id.* at 9).

### 1.    Legal Standard

18    In *Rehberg v. Paulk*, the Supreme Court held that Paulk, an investigator for a

19    district attorney's office, was entitled to absolute immunity in a § 1983 case stemming

20    from his allegedly false testimony before a grand jury.  132 S. Ct. at 1500.  The Supreme

21    Court held that:

22
23
24
25

> grand jury witnesses should enjoy the same immunity as
> witnesses at trial.  This means that a grand jury witness has
> absolute immunity from any § 1983 claim based on the
> witness' testimony.  In addition . . . this rule may not be
> circumvented by . . . using evidence of the witness' testimony
> to support any other § 1983 claim concerning the initiation or
> maintenance of a prosecution.

26
27    *Id.* at 1506.  The Supreme Court explained that "were it otherwise, 'a criminal defendant

28    ───────────────

[6] The facts from Plaintiffs' SAC are taken as true for purposes of a motion under
12(b)(6).  *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves.' " *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part). Moreover, the Supreme Court clarified that absolute immunity encompasses "preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony." *Id.* at 1506–07.

However, *Rehberg* does

> not suggest that absolute immunity extends to all activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits, *see Kalina v. Fletcher*, 522 U.S. 118, 129–131 [] (1997); *Malley v. Briggs*, 475 U.S. 335, 340–345 [] (1986), and fabricate evidence concerning an unsolved crime, *see Buckley*, 509 U.S. at 272–276 [].

*Id.* at 1507 n. 1.  Absolute immunity "does not shield non-testimonial conduct," even where defendants are alleged both to have fabricated evidence and to have later testified at trial.  *Paine v. City of Lompoc*, 265 F.3d 975, 981–82 (9th Cir. 2001) (holding on appeal from the denial of summary judgment in a § 1983 case that the defendants who testified at the previous underlying trial would not be entitled to immunity in the later case if it were shown that they had conspired to fabricate out-of-court evidence in the first case, so long as their conspiratorial conduct was "not 'inextricably tied to their testimony' " in the first case, but ultimately reversing on the basis that no evidence linked the defendants to the alleged conspiracy).  Thus, the distinction between false in-court testimony and non-testimonial, out-of-court fabrication of evidence is critical to the immunity inquiry.  *See Lisker v. City of Los Angeles*, No. CV09-09374 AHM (AJWx), 2013 WL 1276047, at *13–14 (C.D. Cal. Feb. 4, 2013); *Lopez v. Prince*, No. 11-CV-02352-CMA-BNB, 2012 WL 3277178, at *3 (D. Colo. Aug. 9, 2012).

In determining whether a testifying witness enjoys absolute immunity, courts "take what has been termed a 'functional approach.' " *Rehberg*, 132 S. Ct. at 1503 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).  The Court must take into

account "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (internal quotation marks omitted). For example, although prosecutors are absolutely immune for actions taken in their role as advocates, when acting in an investigative capacity, they are only entitled to qualified immunity—a standard that also applies to police officers. *Id.* at 273–74 & n. 5. Thus, "those functions more 'investigative' in nature—searching for 'clues and corroboration'—are more removed from the judicial process and merit only qualified immunity." *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006); *see also Paine*, 265 F.3d at 982 (noting that police officers engaged in investigative conduct are subject to the "immunity standards applicable to those functions, not to those applicable to in-court witnesses, even if the same individual later testifies as a witness").

## 2.   Analysis

Here, the parties disagree about whether Plaintiffs' Section 1983 claims (Counts I, II, III, V, and VI) are based on Hinchey's grand jury testimony or her pre-testimony investigatory work. In construing the nature of Plaintiffs' claims, the Court will first examine the factual allegations common to each claim, and, second, determine the nature of the allegations presented as distinct counts in the SAC.

### a.   Factual Allegations

Applying the functional test to the factual allegations in the SAC, the Court notes that Hinchey's alleged actions can largely be sorted into two categories:[7] related to the fabrication of evidence (and/or collection of purported evidence with reckless disregard for its truth) (*see, e.g.*, SAC ¶¶ 151, 154, 160, 163, 169–70, 172–74, 176–77, 178, 188–90, 196, 204, 206, 214, 217–19, 227); or the presentation of false evidence to the prosecutor (*see, e.g.*, SAC ¶¶ 172, 176, 178, 199, 219, 225, 232–37, 251, 253–54, 260–

---

[7] The Court notes that, in the SAC, Plaintiffs appear to acknowledge the dual categories of their allegations by dividing their allegations against Hinchey into two headings: "Defendant Hinchey's Investigation" (Doc. 197 at 17 (containing ¶¶ 138–240)) and "Decision to Prosecute Plaintiff Officers" (*id.* at 28 (containing ¶¶ 241–69). Plaintiffs' § 1983 Counts against Hinchey specifically reallege the majority of both sections. (*Id.* at ¶¶ 309, 321, 333, 357, 371).

61).  Because the "fabrication of evidence" category contains allegations that, during her multi-year investigation, Hinchey falsified, ignored, and improperly collected evidence, these allegations clearly concern Hinchey's "investigatory" function.[8]

Hinchey's "function" with regard to the allegations in the "presentation of false evidence to the prosecutor" category,[9] however, is not so clear.  Because it is undisputed not only that Hinchey presented said evidence to the grand jury, but also that she was the sole witness in support of the indictment (SAC ¶¶ 255–58), the Court must determine if Hinchey's conduct in presenting the false evidence to the prosecutor prior to her grand jury testimony is not "inextricably tied" to her later grand jury testimony.  *See Lisker*, 2013 WL 1276047, at *15–16.

> "In using the phrase 'inextricably tied,' [Ninth Circuit Court of Appeals precedent] stand[s] for the proposition that on this motion the Court must determine whether [Hinchey's presentation of false evidence to the prosecutor was] part of any express plan by [Hinchey] to commit perjury or to have such evidence lead to perjurious testimony.  If so, that conduct would be immune from liability, since the inherent object of such a conspiracy is the commission of perjury.  The extension of absolute testimonial immunity to encompass conspiracies to testify falsely is a means of preventing an end-run around the immunity afforded trial testimony.  And that, in short, is the basis for the "inextricably tied" concept.  *See Paine*, 265 F.3d at 981 ("Recognizing that plaintiffs could easily circumvent witness immunity by alleging that a witness had conspired to commit perjury rather than alleging that the witness had actually committed perjury, we have held that witness immunity also extends to conspiracies to commit perjury.").

*Lisker*, 2013 WL 1276047, at *16 (analyzing *Franklin v. Terr*, 201 F.3d 1098, 1101–02

---

[8] For example, Plaintiffs allege that Hinchey "failed to ask the PPD officers that she interviewed critical questions" (SAC ¶ 153), "falsely informed her supervisors that she reviewed every element of data used to create the PSB spreadsheet" (SAC ¶ 154), falsely reported "that she had ascertained the terms and conditions of the oral contract between Contreras and the Townhomes" (SAC ¶ 160), and falsely reported MDT sign-on and sign-off times (SAC ¶ 173).

[9] For example, Plaintiffs allege that Hinchey presented evidence to the "prosecutor purportedly supporting felony charges against Plaintiff[s ] that was either deliberately fabricated or presented with a reckless disregard for the truth" (SAC ¶ 253), "withheld relevant and exculpatory evidence" from the prosecutor "in order to obtain indictment" (SAC ¶ 260), and "submitted false information about the facts of the case" to the prosecutor "in order to obtain indictment" (SAC ¶ 261).

(9th Cir. 2000), and *Paine*, 265 F.3d at 981–82).

The conduct alleged here—presentation of false evidence (fabricated evidence and purported evidence with reckless disregard for its truth) to the prosecutor in order to obtain an indictment—is inextricably tied to Hinchey's grand jury testimony. Plaintiffs allege that Hinchey concluded her nearly three-year investigation and subsequently presented false evidence to the prosecutor for the purposes of obtaining an indictment for political gain, despite knowing that the evidence did not support probable cause. (*See* SAC ¶¶ 249, 253, 260–61; *see also* Doc. 217 at 9 n. 50 ("Hinchey present[ed] false evidence *in order to* mislead the prosecutor into bringing criminal charges.") (emphasis added)). First, at least some of the evidence Hinchey presented to the prosecutor did not have a physical analog and, therefore, was necessarily based solely on Hinchey's testimony. (SAC ¶ 167 ("Hinchey failed to have her interview of [a Townhomes witness regarding the terms of the Townhomes contract] transcribed or summarized until after the indictment against Plaintiff[s ] was released.")).

Second, the bulk of the false evidence presented to the prosecutor consisted primarily of Hinchey's own investigative reports, including a spreadsheet maintained by Hinchey that Hinchey falsely reported to be an accurate compilation of all available evidence regarding the shift sign-in and sign-out times of Plaintiffs. (*See* SAC ¶¶ 123–24, 145–46, 150, 154, 186, 237–38). Despite Plaintiffs' characterization of the spreadsheet as "independent evidence," the actual "evidence" is the independent MDT and radio logs used to create the spreadsheet. The spreadsheet, itself, is merely a tool Hinchey used to organize, manipulate, and draw false conclusions from the actual evidence. Because Hinchey had maintained the spreadsheet for nearly three years and falsely claimed to have "reviewed every element of data used to create the PSB spreadsheet" (SAC ¶ 154), Hinchey would have reasonably expected to have been called before the grand jury to testify to her deliberately fabricated (or made with reckless disregard for the truth) interpretations of and conclusions from the underlying data. Thus, the deliberate fabrications or reckless disregard for the truth that Plaintiffs allege

- 14 -

Hinchey presented to the prosecutor was not in regard to the underlying and independent evidence in Hinchey's investigation, but rather to Hinchey's conclusions about the criminal import of the independent evidence.[10]

Third, the temporal immediacy of Hinchey's presentation to the prosecutor demonstrates Hinchey's perjurious intent.  Plaintiffs allege that, facing an impending election and media scrutiny, the attorney general "encouraged" Hinchey "to conclude her investigation so indictments could be announced before Election Day," despite the attorney general's "knowledge that the charges against Plaintiff[s ] lacked probable cause."  (SAC ¶¶ 244, 247–49).  Given the short time frame necessary to secure the indictment before its political benefits would dissipate, it was both necessary and inevitable that Hinchey would be asked to repeat her false presentation to the Prosecutor to the grand jury.  Although a forensic expert could have been hired to independently review and testify to the MDT and radio data Hinchey relied on in creating the spreadsheet, offering the spreadsheet data to the grand jury with a witness other than Hinchey would have necessarily delayed the return of an indictment.  Thus, at the time Hinchey presented the false evidence to the prosecutor, it was likely that Hinchey would be the sole person testifying to the grand jury about her investigation and conclusions (which is what, in fact, occurred (SAC ¶¶ 255–56)).  Therefore, the natural conclusion from Plaintiffs' allegations is that Hinchey's presentation of false evidence to the prosecutor was part of an express plan by Hinchey to commit perjury or to have such false evidence lead to perjurious testimony.

Thus, Hinchey's conduct—presenting false evidence to the prosecutor in order to secure an indictment—was, functionally, preparatory discussions with the prosecutor

---

[10] Furthermore, if the falsity of the sign-in and sign-out data was as apparent as Plaintiffs allege (*e.g.* Hinchey calculating officer shift-lengths without regard for the up-to 45 minutes of roundtrip drive-time between the South Mountain Precinct and the Townhomes (SAC ¶¶ 228–29) or falsely reporting that she applied a 15-minute adjustment to every officer's shift to account for prep-time (SAC ¶ 277)), then an independent audit of Hinchey's spreadsheet with the actual MDT and radio data would have easily uncovered Hinchey's falsities.  Thus, the deliberately fabricated or recklessly untrue evidence could only have been presented to the grand jury as true if Hinchey, as the sole witness on the matter, perjuriously testified to its veracity.

regarding Hinchey's intended grand jury testimony.  Hinchey is entitled to absolute immunity for her pre-testimony preparatory activities.  *Rehberg*, 132 S. Ct. at 1499 ("a criminal defendant turned civil plaintiff [may not] reframe a claim to attack the preparatory activity—such as a preliminary discussion in which the witness relates the substance of his intended testimony—rather than the absolutely immune actions themselves"); *Franklin*, 201 F.3d at 1101–02 (holding that absolute testimonial immunity extends back in time from the trial to encompass previously-hatched conspiracies to testify falsely at trial including preparatory discussions between or among witnesses about what they will say during the trial).

Therefore, to the extent that Plaintiffs' claims are based upon Hinchey's presentation of false evidence to the prosecutor in order to obtain an indictment (e.g. initiating the prosecution against Plaintiffs) or Hinchey's conduct in front of the grand jury, Hinchey is absolutely immune from liability on these claims.  However, to the extent that Plaintiffs' claims are based on Hinchey's pre-presentation investigatory activities (*e.g.* fabrication and of evidence and reckless disregard for the truth),[11] Hinchey is only eligible for qualified immunity.  *See Rehberg*, 132 S. Ct. at 1507 n. 1.

### b.   Construing Plaintiffs' Claims

In their SAC, Plaintiffs allege five § 1983 claims against Hinchey that are based on the factual allegations described above: Counts I, II, III, V, and VI.[12]  Although each Count specifically realleges the majority of both the "fabrication" and "presentation"

---

[11]     [A] pretrial, out-of-court effort . . . to fabricate physical evidence need not involve anyone who will participate in the trial as a witness, and so is not 'inextricably tied'—or tied at all—to any witness' own testimony.  If a potential witness does happen to be involved, there is no reason that participation should be insulated from liability simply because of his dual roles as witness and fabricator (although the potential witness of course retains his absolute immunity as to his own testimony in court).

*Paine*, 265 F.3d at 982 (quoting *Franklin*, 201 F.3d at 1102).

[12]  Count XIII is a § 1983 claim based on an allegation that "Hinchey failed to provide exculpatory information to Plaintiff[s ] counsel during the discovery phase of the criminal case against Plaintiff[s ]."  (SAC ¶ 442; *see* SAC  at 51, ¶¶ 440–46).

allegations (*id.* at ¶¶ 309, 321, 333, 357, 371), Plaintiffs strenuously argue that their Section 1983 claims "are based on Defendant Hinchey's *presentation* of false evidence to the prosecutors."[13]  (Doc. 217 at 9) (emphasis added).  In case any doubts as to Plaintiffs' intentions remain, Plaintiffs further argue that they "could not be more clear that their claims, with few exceptions,[14] are based on Defendant Hinchey presenting false evidence in order to mislead the prosecutor into bringing criminal charges."  (*Id.* at 9 n. 50).  Upon reviewing the content of the individual counts, the Court finds that Counts I, II, III, and VI are, indeed, based on Hinchey's presentation of false evidence to the prosecutor in order to obtain an indictment.

- Count I is labeled as "intentional *presentation* of false evidence to support criminal charges" and alleges that Plaintiffs "had the constitutional right to be free from criminal prosecution based upon the *presentation* of false evidence." (SAC at 35 & ¶ 310 (emphasis added)).  Although Count I also mentions the fabrication of evidence (SAC ¶¶ 315, 318–19), when read in the context of the entire SAC, the Court construes Count I as being based on Hinchey's alleged *presentation* of fabricated evidence to the prosecutor for the purposes of perjuriously demonstrating probable cause, rather than the actual fabrication of evidence during Hinchey's investigation.

- Count II is labeled "*presentation* of false evidence to support criminal charges with a reckless disregard for the truth" and alleges that Plaintiffs "had the constitutional right to be free from criminal prosecution based upon false evidence *presented* with reckless disregard for the truth."  (SAC at 36 & ¶ 322 (emphasis added)).  Count II repeatedly refers only to the *presentation* of false evidence (SAC ¶¶ 327, 330–31), and, therefore, the Court construes Count II as being based

---

[13] Although Plaintiffs contend that the presentation to the prosecutors was "without regard to the presentation of evidence to the grand jury" (Doc. 217 at 9), as explained above, the two are inextricably tied.

[14] Presumably Plaintiffs are referring to Count XIII, which alleges violations of criminal disclosure obligations.  (SAC at 51, ¶¶ 440–46).

on Hinchey's presentation to the prosecutor for the purposes of perjuriously demonstrating probable cause, not some nebulously implied "presentation" during her investigation.

- Count III is labeled as "malicious prosecution" and alleges that Hinchey "initiated and took part in the prosecution of criminal actions against" Plaintiffs without probable cause.  (SAC at 37 & ¶¶ 336, 340).  Count III further alleges that "Hinchey *presented* fabricated evidence and/or false evidence with a reckless disregard for the truth."  (SAC ¶¶ 344–45 (emphasis added)).  When read in the context of the entire SAC, Hinchey's "initiation" of the criminal prosecution undoubtedly refers to Hinchey's presentation of false evidence to the prosecutor.  Similarly, Hinchey's "taking part in" the prosecution of criminal charges undoubtedly refers to Hinchey's grand jury testimony and Plaintiffs' allegation that Hinchey continued to present false evidence to the prosecutor while Plaintiffs were under indictment (SAC ¶ 268), presumably in order to maintain the indictment.  These allegations against Hinchey are inextricably tied to her testimony to the grand jury because it was this testimony and Hinchey's continued support of it that allegedly led to Plaintiffs' indictment, arrest, and injuries.  *See Lopez*, 2012 WL 3277178, at *3 (holding that an FBI agent is entitled to absolute immunity because allegations of presenting fraudulently induced and manufactured evidence to a grand jury and instituting or continuing a criminal prosecution with malice and without probable cause hinged upon the agent's grand jury testimony).  Thus, the Court construes Count III as being based on Hinchey's presentation to the prosecutor, not her investigation.
- Count V is labeled "violations of *Garrity*-protected rights" and alleges that Hinchey acquired and misused *Garrity*-protected information during her investigation.  (SAC at 40 & ¶¶ 363–64, 366, 369).  The Court construes Count V as referring to Hinchey's investigation, not her presentation to the prosecutor.
- Count VI is labeled "conspiracy to violate constitutional rights" and alleges that

- 18 -

Hinchey "conspired" with the prosecutor and others "to *present* false evidence . . . in order to obtain a criminal indictment under false pretenses."  (SAC at 42, ¶¶ 373 (emphasis added)).   Plaintiffs further allege that Hinchey and Veach discussed false evidence and "agreed to utilize false evidence . . . to mislead the [] prosecutor into pursuing criminal charges against Plaintiff[s ]."  (SAC ¶ 374).   Plaintiffs further allege that Hinchey, Veach, and the prosecutor further conspired to "maintain criminal charges against" Plaintiffs despite knowing that Hinchey's "*grand jury presentation* contained false and misleading information." (SAC ¶ 375 (emphasis added)).   Alleging conspiracy to commit perjury or to present evidence for the purposes of leading to perjury is precisely the type of reframed claim that *Rehberg* bars.  132 S. Ct. at 1499.  Consequently, the Court construes Count VI as being based on Hinchey's presentation to the prosecutor, not her investigation.

In sum, the Court construes Counts I, II, III, and VI as being based on Hinchey's presentation of false evidence to the prosecutor—a preparatory activity inextricably tied to Hinchey's later grand jury testimony—and not on her pre-testimonial investigatory conduct.   Because Hinchey is entitled to absolute immunity for both her grand jury testimony and preparatory activities inextricably tied to it, Counts I, II, III, and VI fail to state a claim against Hinchey on which relief can be granted.   Accordingly, the Court grants Hinchey's motion to dismiss with respect to Counts I, II, III, and VI.

### b.    The Sufficiency of the Pleadings

Hinchey generally argues that each of Plaintiffs' § 1983 claims (Counts I, II, III, V, VI, and XIII) are insufficiently pleaded under *Twombly* and *Iqbal*, and therefore fail to state a claim.  (*Id.* at 3–4).  Additionally, Hinchey specifically argues that Counts III, VI, and XIII fail to state a claim.  (*Id.* at 10–14).  Because the Court will dismiss the § 1983 claims in Counts I, II, III, and VI on absolute immunity grounds, Hinchey's alternative arguments supporting dismissal are moot.  Consequently, the Court will only address whether Counts V and XIII state a claim.

- 19 -

1

2

### 1. Count V: § 1983—Violations of *Garrity*-Protected Rights

3

Hinchey generally argues that Count V "lack[s] the requisite specificity" and only

4

contains "general allegations that are insufficient" to "specify the federal right alleged to

5

have been violated." (Doc. 197 at 3–4). With regard to specificity, Count V is labeled

6

"violations of *Garrity*-protected rights" and alleges that Hinchey acquired and misused

7

*Garrity*-protected information during her investigation. (SAC at 40 & ¶¶ 363–64, 366,

8

369). *Garrity v. New Jersey* holds that the state cannot use the incriminatory statement of

9

an employee secured under threat of job loss in a subsequent criminal proceeding.

10

385 U.S. 493, 500 (1967). Additionally, the Ninth Circuit Court of Appeals has

11

recognized a *Garrity* right to be free from providing incriminating statement as a

12

condition for continued employment. *See, e.g.*, *Aguilera v. Baca*, 510 F.3d 1161, 1171

13

(9th Cir. 2007). Thus, in Count V, Plaintiffs have specified the federal right alleged to

14

have been violated.

15

However, to state a claim, Plaintiffs must also give fair notice of the grounds upon

16

which the claim rests. *Twombly*, 550 U.S. at 555. To do so, Plaintiffs must plead

17

"factual content that allows the court to draw the reasonable inference that the defendant

18

is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*,

19

550 U.S. at 570). Here, Plaintiffs have failed to plead sufficient factual allegations in the

20

SAC to support Count V.[15]

21

The SAC rests Count V on two actions: (1) Veach "provid[ing] 'what she knew'

22

about the Townhomes investigation to Defendant Hinchey, including *Garrity*-protected

23

information" (SAC ¶ 363); and (2) Hinchey "continu[ing] to use Defendant Veach as a

24

resource for the AGO criminal investigation even after she learned that Defendant Veach

25

_____

26

[15] The Court notes that because the SAC only alleges that two officers were

27

compelled to give *Garrity*-protected interviews (Plaintiff Sywarungsymun and third-party Contreras) (SAC ¶ 93–94), Count V applies only to Plaintiff Sywarungsymun (and not to the other three plaintiffs). Furthermore, Plaintiffs make no arguments, and the Court

28

finds none, as to how Plaintiffs Heck and Aaron and Shannon Lentz can state a § 1983 claim for a *Garrity* violation allegedly perpetrated against co-Plaintiff Sywarungsymun.

had information that was learned through *Garrity* protected statements" (SAC ¶ 364). However, the SAC does *not* allege that Hinchey received or used *Garrity*-protected information from Sywarungsymun.  (*See* SAC ¶¶ 94, 97, 134–36, 147–49, 363–64). Rather, the SAC alleges that Veach "communicated 'what she knew' regarding the PSB investigation" to Hinchey (SAC ¶¶ 148, 363), and that "[w]hat Defendant Veach 'knew' included information gained from the *Garrity*-protected statements of *George Contreras*" (SAC ¶ 149 (emphasis added)).  The SAC also specifically alleges that Veach used the *Garrity*-protected statement of Contreras as the "source of [Veach's] information" about the "Townhomes off-duty job" that Veach presented to Hinchey.  (SAC ¶ 135).

In contrast to the specificity with which the SAC alleges violations of Contreras' *Garrity* rights, the SAC contains no specific factual allegation that Veach ever communicated Sywarungsymun's *Garrity*-protected information to Hinchey.  (*See* SAC ¶¶ 1–4, 6–11, 91–94, 97–98, 103–08, 125, 130–32, 146–49, 159–62, 259–61, 263–64, 292–96, 298–307, 357–70 (every paragraph specifically incorporated into Count V)). Thus, the SAC rests Count V on the factual ground that Veach communicated Contreras' *Garrity*-protected information to Hinchey.

Plaintiffs make no arguments,[16] and the Court finds none, as to how Plaintiffs can state a § 1983 claim for a *Garrity* violation allegedly perpetrated against third-party Contreras.  Therefore, the Court finds that Count V fails to state a claim upon which relief can be granted.  Accordingly, the Court grants Hinchey's motion to dismiss with respect to Count V.

### 2.   Count XIII: § 1983—Violations of Criminal Disclosure Obligations

Hinchey generally argues that Count XIII "lack[s] the requisite specificity" and only contains "general allegations that are insufficient" to "specify the federal right

---

[16] Indeed, Plaintiffs' only mention of Count V in their Response is a single sentence clarifying the nature of the federal claim: "Count V alleges that Defendant Hinchey violated Plaintiff Sywarungsymun's Fifth Amendment rights by receiving information that was compelled as a condition of his employment under the protection of *Garrity v. New Jersey*."  (Doc. 217 at 3).

alleged to have been violated."  (Doc. 197 at 3–4).  With regard to specificity, Count XIII is labeled "violations of criminal disclosure obligations" and alleges that Hinchey "failed to provide exculpatory information to [Plaintiffs'] counsel during the discovery phase of the criminal case against Plaintiff[s]."  (SAC at 51 & ¶¶ 440–46).  Notably, in their Response, Plaintiffs explicitly clarify the federal claim pleaded in each of the other five § 1983 Counts, but make no mention of Count XIII.  (Doc. 217 at 2–3).  Nonetheless, "criminal disclosure obligations" in the discovery context appears to be an allusion to the rights conferred by *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963), which held that failing to disclose material exculpatory evidence is a violation of a criminal defendant's due process rights.  Thus, in Count XIII, Plaintiffs have specified the federal right alleged to have been violated.

Perhaps anticipating the Court's interpretation of Count XIII as a *Brady* violation, Hinchey also specifically argues that the fact that Plaintiffs were not convicted precludes Plaintiffs from proving the materiality element of a *Brady* violation.  (*Id.* at 11–13).  The Ninth Circuit Court of Appeals has recently surveyed the state of *Brady*-jurisprudence and found that "[n]o known cases have allowed a *Brady*-based § 1983 claim where there has not been a conviction."  *Smith v. Alameda*, 640 F.3d 931, 941–42 (9th Cir. 2011).

Plaintiffs make no arguments,[17] and the Court finds none, as to how Plaintiffs can state a § 1983 claim for a *Brady* violation when Plaintiffs were never even tried, let alone convicted.  Therefore, the Court finds that Count XIII fails to state a claim upon which relief can be granted.  Accordingly, the Court grants Hinchey's motion to dismiss with respect to Counts XIII.

### C.    Rule 12(b)—Failure to Exhaust Non-Judicial Remedies

#### 1.    Legal Standard

"A claimant who asserts that a public employee's conduct giving rise to a claim for damages was committed within the course and scope of employment must give notice

---

[17] Indeed, in their Response, Plaintiffs make no mention of Count XIII.  (*See* Doc. 217).

of the claim to both the employee individually and to his employer." *Crum v. Superior Court*, 922 P.2d 316, 317 (Ariz. Ct. App. 1996) (citing *Johnson v. Superior Court*, 763 P.2d 1382, 1384 (Ariz. Ct. App. 1988). The statute authorizing claims against public employees provides, in relevant part:

> Persons who have claims against a public entity or a public employee shall file claims with the person or persons authorized to accept service for the public entity or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim which is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

A.R.S. § 12–821.01(A). These statutory requirements serve "to allow the public entity to investigate and assess liability, to permit the possibility of settlement prior to litigation, and to assist the public entity in financial planning and budgeting." *Falcon ex rel. Sandoval v. Maricopa County*, [] 144 P.3d 1254, 1256[ ¶ 9] (Ariz. 2006) (quoting *Martineau v. Maricopa County*, [] 86 P.3d 912, 915–16[ ¶ 19] (Ariz. Ct. App. 2004)). Claims that do not comply with the statute are barred and no action may be maintained. A.R.S. § 12–821.01.

A failure to exhaust non-judicial remedies should be treated as a matter in abatement, which is subject to an unenumerated Rule 12(b) motion to dismiss. *Payan v. City of Phoenix*, No. CV-09-1917-PHX-JAT, 2010 WL 4574149, at *2–3 (D. Ariz. Nov. 5, 2010) (citing *Wyatt v. Terhune*, 315 F.3d 1108, 1119–20 (9th Cir. 2003)). In deciding a motion to dismiss for failure to exhaust non-judicial remedies, the court may look beyond the pleadings and decide disputed issues of fact. *Id.*

### 2.    Analysis

Plaintiffs' SAC contains four claims arising under State of Arizona tort law: Counts III (malicious prosecution), VII (negligence and gross negligence), IX (intentional inflection of emotional distress), and XIII (violations of criminal disclosure

1    obligations).[18]  (Doc. 180 at 37, 44, 47, 51).  The Arizona notice of claim statute provides

2    that anyone with a claim against a public employee must file a notice of claim with the

3    public employee within 180 days of the accrual of the cause of action.

4    A.R.S. § 12–821.01(A).

5         Hinchey argues that each of Plaintiffs' Arizona state law claims (Counts III, VII,

6    IX, and XIII) must be dismissed because Plaintiffs failure to comply with Arizona's

7    notice of claim statute bars their state law claims.  (Doc. 197 at 14–17).  Specifically,

8    Hinchey argues that she was never properly served a Notice of Claim (*id.* at 15–16) and,

9    alternatively, that service of the Notice of Claim was untimely (*id.* at 16–17).

10                    **a.    Service of Process**

11        Hinchey argues that Plaintiffs' Notice of Claim was not "individually" served on

12   Hinchey, as required by the Arizona notice of claim statute.  Arizona courts have made

13   clear that "[w]hen a person asserts claims against a public entity and public employee, the

14   person 'must give notice of the claim to *both* the employee individually and to his

15   employer.' "  *Harris v. Cochise Health Sys.*, 160 P.3d 223, 230 ¶ 25 (Ariz. Ct. App.

16   2007) (quoting *Crum*, 922 P.2d at 317 (emphasis in original)).  The Arizona notice of

17   claim statute explicitly specifies that the Notice of Claim must be filed with a person

18   authorized by the Arizona Rules of Civil Procedure to accept service.

19   A.R.S. § 12–821.01.  Pursuant to Ariz. R. Civ. P. 4.1(d), service upon an *individual*

20   means either personal service, service at the individual's dwelling house or usual place of

21   abode through a person of suitable age and discretion then residing therein, or service

22   through an agent authorized by appointment or by law to receive service on behalf of the

23   individual.  Because it is undisputed that Plaintiffs neither personally served Hinchey nor

24   effectuated service through an individual at Hinchey's residence (*see* Doc. 217 at 13–14,

25   Ex. A; Doc. 197 at 14–16, Exs. C–D), Plaintiffs must demonstrate that they properly

26   completed individual service upon Hinchey through Hinchey's agent.

27   
     _____

28         [18] The Arizona notice of claim statute applies only to state law claims; it does not
     apply to Plaintiffs' § 1983 claims.

Here, Plaintiffs argue that a licensed private process server "completed service" on Hinchey "by leaving the [Notice of Claim] with [Ms.] Fisher, an employee of the AGO."[19]  (Doc. 217 at 13–14, Ex. A).  Plaintiffs further allege that Ms. Fisher "regularly receives service of process for certain employees of the AGO" and that she "specifically stated that she was authorized to accept service of the Notice of Claim on behalf of Defendant Hinchey."  (Id.).  Hinchey, however, submits two uncontroverted affidavits avowing that she has "not authorized any person or entity to accept service on [her] behalf" (Doc. 197 at Ex. C) and has "*never* authorized Ms. Fisher to accept service of process on [her] behalf either in an official or an individual capacity" (*id.* at Ex. D).  Moreover, in response to Plaintiffs' non-uniform interrogatories, the State of Arizona, through its counsel, has unequivocally stated that "Ms. Fisher was not authorized to accept service of process on behalf of employees of the Attorney General's Office, including, but not limited to . . . Hinchey, on the date of delivery of Plaintiffs' Notice of Claim."  (*Id.* at Ex. E pp. 4–5).  Thus, even assuming that Plaintiffs' allegations regarding Ms. Fisher's practice of accepting service for AGO employees and statement to the process server that Ms. Fisher was authorized to accept service for Hinchey are true, at best Plaintiffs have alleged that Ms. Fisher possessed the apparent authority to accept service on behalf of Hinchey.

In the context of service of process of a Notice of Claim on an individual, apparent authority is insufficient to effectuate service; rather, the agent must *actually* be "authorized by appointment or by law to receive service of process." Ariz. R. Civ. P. 4.1(d); *see Batty v. Glendale Union High Sch. Dist. No. 205*, 212 P.3d 930, 934 ¶ 16 (Ariz. Ct. App. 2009) (holding that service upon the Superintendent of the school district was insufficient service on the district, as the Superintendent had not been properly designated to assume the authority to accept service for the district); *see also Hughes v. Kisela*, No. CV-11-00366-TUC-FRZ,

---

[19] Plaintiffs allege that because the AGO building is secure, their private process server regularly serves AGO employees "by providing the appropriate paperwork to the desk aide seated just inside the security checkpoint."  (Doc. 217 at 13).

2012 WL 1605904, at *1–2 (D. Ariz. May 8, 2012) (holding that a defendant officer was not individually served where the plaintiff mailed the notice of claim to the defendant "in care of" the police department employing the defendant officer); *Simon v. Maricopa Med. Ctr.*, 234 P.3d 623, 629–30 ¶¶ 20–22 (Ariz. Ct. App. 2010) (holding that defendant Phoenix police officers were not individually served where the plaintiff sent his notices of claim via certified mail to the clerk of the City of Phoenix).  Here, Hinchey avows that Ms. Fisher was never appointed as an agent authorized to accept service on Hinchey's behalf.  Because Plaintiffs neither argue that Hinchey's avowal is false nor proffer any admissible[20] evidence to contradict that avowal (*see* Doc. 217), the Court must conclude that Plaintiffs did not individually serve the Notice of Claim on Hinchey.  *See Simon*, 234 P.3d at 629–30 ¶ 22.

Nonetheless, Plaintiffs argue that because Hinchey received actual notice of the claims against her no later than May 3, 2012, approximately three weeks after the April 11 attempted service, Plaintiffs have substantially complied with and fulfilled the purposes of Arizona's notice of claim statute.  (Doc. 217 at 14).  Even if true, Arizona Courts require strict compliance with A.R.S. § 12–821.01(A); substantial compliance is insufficient.  *Falcon ex rel. Sandoval v. Maricopa County*, 144 P.3d at 1256, ¶ 10 (Ariz. 2006) (Actual notice and substantial compliance do not excuse failure to comply with the statutory requirements of A.R.S. § 12–821.01(A)) (citing *Martineau*, 86 P.3d at 915 ¶¶ 15, 17 (Ariz. Ct. App. 2004)); *Simon*, 234 P.3d at 630 ¶¶ 23–24.

In sum, the evidence, even when construed in Plaintiffs' favor, does not support a finding that she actually delivered a notice of claim to Defendant, individually.  Because compliance with the notice of claim statute is a "mandatory" and "essential" prerequisite to suit, *Harris*, 160 P.3d at 230 ¶ 25, Plaintiffs failure to comply "bars *any* claim" against

---

[20] Plaintiffs' only potential proffer is the declaration of their process server that Ms. Fisher "stated authorized to accept."  (Doc. 217 at Ex. A).  This statement contradicts Hinchey's statement only if it is offered for the truth of the matter asserted: that Ms. Fisher was, in fact, the authorized agent of Hinchey.  Admitting the statement for such a use violates the rule against hearsay, Fed. R. Evid. 801–02, and Plaintiffs have made no attempt to justify its admissibility (*see* Doc. 217).

Hinchey.  *Salerno v. Espinoza*, 115 P.3d 626, 628 ¶ 7 (Ariz. Ct. App. 2005) (quotation and citation omitted).   Accordingly, the Court grants Hinchey's motion to dismiss Plaintiffs' Arizona state law claims against Hinchey (Counts III, VII, IX, and XIII).

### b.    Timeliness of Service

Because the Court finds that Plaintiffs failed to properly serve Hinchey with the Notice of Claim, Hinchey's alternative timeliness argument is moot and the Court takes no position on its merits.

### D.    Conclusion

For the reasons explained above, the Court grants Hinchey's Motion to Dismiss (Doc. 197) with respect to all eight of Plaintiffs' claims in the SAC against Hinchey (Counts I, II, III, V, VI, VII, IX, and XIII).

## III.    THE MOTIONS FOR SUMMARY JUDGMENT (Docs. 213, 257, 291, 293)

### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1).  Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the non-movant to establish the existence of material fact. *Id.*  The non-movant "must do

more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. Further, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (internal citations omitted).

### B. Hinchey's Motion for Summary Judgment on Qualified Immunity Grounds (Doc. 213)

Because the Court grants Hinchey's Motion to Dismiss (Doc. 197) with respect to all eight of Plaintiffs' claims in the SAC against Hinchey (Counts I, II, III, V, VI, VII, IX, and XIII), Hinchey's Motion for Summary Judgment on Qualified Immunity Grounds (Doc. 213) is moot. Accordingly, the Court takes no position on the merits of Hinchey's motion and denies it as moot.

### C. Plaintiffs' Cross-Motion for Partial Summary Judgment Against Hinchey on Counts I and II of the SAC (Doc. 291)

Because the Court grants Hinchey's Motion to Dismiss (Doc. 197) with respect to Counts I and II of the SAC, Plaintiffs' Cross-Motion for Partial Summary Judgment Against Hinchey on Counts I and II of the SAC (Doc. 291) is moot. Accordingly, the Court takes no position on the merits of Plaintiffs' motion and denies it as moot.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.     Veach and the City of Phoenix's Motion for Summary Judgment Regarding Immunity (Doc. 257)

#### 1.     The Claims Against Veach

Plaintiffs' SAC (Doc. 180) contains seven claims against Veach: Counts I, II, III, V, VI, VII, and IX.  Veach argues that he is entitled to summary judgment on each of the five § 1983 claims (Counts I, II, III, V, and VI) on qualified immunity grounds because Plaintiffs' cannot establish a genuine dispute of material fact whether Veach violated Plaintiffs' constitutional rights.  (Doc. 257 at 6–14; Doc. 318 at 2–10).  Veach also argues that, to the extent Plaintiffs' § 1983 claims against Veach are predicated on grand jury testimony, Veach is entitled to absolute immunity.  (Doc. 257 at 6).  Lastly, Veach argues that if the Court grants summary judgment to Veach on all of the federal (§ 1983) claims, then the Court should decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  (*Id.* at 15).

#### a.     Legal Standard for Qualified Immunity

There is a two-step test for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified immunity inquiry."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right.  *Id.*  If so, a court turns to the "qualified immunity inquiry" and asks if the right was clearly established at the relevant time.  *Id.* at 201–02.  This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at 201.  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A dispositive inquiry in the qualified immunity analysis "is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  "Courts should decide issues of qualified immunity as

- 29 -

early in the proceedings as possible, but when the answer depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury."  *See Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998).

### b.   Analysis of Plaintiffs' § 1983 Claims[21]

#### 1.   Counts I and II: § 1983—Intentional Presentation of False (Fabricated) Evidence to Support Criminal Charges & Presentation of False Evidence to Support Criminal Charges with a Reckless Disregard for the Truth[22]

Veach argues that because her conduct "could not and did not result in criminal charges against Plaintiffs," Plaintiffs cannot meet an essential element of their deliberate fabrication of evidence (Count I) and presentation of false evidence with a reckless disregard for the truth (Count II) claims.  (Doc. 257 at 7–8).  Veach also argues that Plaintiffs cannot demonstrate a genuine dispute of material fact that Veach deliberately fabricated evidence.  (*Id.* at 8–9).  "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."  *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc).  With regard to the fabrication element, in order to prevail on a § 1983 "deliberate-fabrication-of-evidence claim," a plaintiff

> must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so

---

[21] Here, Veach argues that because "[t]here is no evidence that [Veach] violated Plaintiffs' constitutional rights, . . . there is no need for further inquiry into whether Plaintiffs' rights were clearly established."  (Doc. 257 at 14).  Consequently, the Court's analysis focuses solely on the "constitutional violation" prong of the qualified immunity test and the Court takes no position on whether any constitutional right alleged to have been violated was "clearly established" at the relevant time.  *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

[22] The Court discusses both the fabrication and reckless claims together because both Parties comingle the claims in their briefs.  (Doc. 257 at 7–9; Doc. 296 at 6–14; Doc. 318 at 5–10).  Additionally, Plaintiffs argue (Doc. 296 at 7) and Veach does not dispute (Doc. 257 at 7–9; Doc. 318 at 5–10) that "recklessness" is equivalent to "deliberate fabrication" for the purposes of the instant qualified immunity inquiry.

coercive and abusive that they knew or should have known that those techniques would yield false information.

*Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012) (quoting *Devereaux*, 263 F.3d at 1076).

Initially, the Court notes that Plaintiffs cannot demonstrate that Veach violated Plaintiffs' constitutional rights because the Court finds that Plaintiffs have not demonstrated a genuine issue of material fact that Veach's incomplete and inconclusive *administrative* investigation and later liaison conduct (which allegedly included discussing false evidence with Hinchey and the AGO) were the basis for subjecting Plaintiffs to criminal charges. *See infra*, Part III.D.1.b.2. (finding that the undisputed evidence in the record demonstrates that Hinchey and the AGO did not rely on Veach's administrative investigation, evidence, or assistance, Veach was not actively instrumental in causing the criminal proceedings, and the AGO based the criminal charges against Plaintiffs' on Hinchey's three-year independent investigation, including allegedly false evidence fabricated and presented by Hinchey).

However, Plaintiffs imply (*compare* Doc. 296 at 6–14, *with id.* at 15–17) that the "subjected to criminal charges on the basis of false evidence" element of a deliberate-fabrication-of-evidence claim, *Devereaux*, 263 F.3d at 1074–75, requires different causation analysis of Veach's conduct than the "actively instrumental in causing the initiation of legal proceedings" element of a malicious prosecution claim, *Awadby v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). Assuming, *in arguendo*, that *Devereaux*'s "subjected to on the basis of" causation element allows Veach's conduct to have played less of a role in the initiation of the criminal proceedings against Plaintiffs than *Awadby*'s "actively instrumental" element, the Court finds that Plaintiffs have nonetheless failed to demonstrate a genuine dispute over material fact that Veach's conduct subjected Plaintiffs to criminal charges on the basis of false evidence.

When viewed in the light most favorable to Plaintiffs, the evidence in the record cited by Plaintiffs only demonstrates that Veach's incomplete and inconclusive

administrative investigation was "flawed" and contained careless or inaccurate representations of the facts. (*See* PSOF ¶¶ 85, 96–97; DCSOF ¶¶ 85, 96–97). A careless or inaccurate investigation that does not ensure an error-free result does not rise to the level of a constitutional violation. *See Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) (holding that claims based on an investigator's mere carelessness or inaccuracy do "not satisfy *Devereaux*'s stringent test"). Here, the lack of a constitutional violation is especially evident because it is undisputed that the AGO knew Veach's investigation was incomplete when it was turned over to the AGO, Veach "provided ongoing reminders of this fact," and prior to the filing of criminal charges, Veach informed "Hinchey that the PSB spreadsheet was incomplete and contained errors." (PSOF ¶¶ 99–100; DCOF ¶¶ 99–100). Although Plaintiffs' argue that "the scope of [Veach's] explanation to the AGO is still a matter of dispute" (Doc. 296 at 12 (citing PSOF ¶¶ 145–47)), the evidence Plaintiff cites does not demonstrate a genuine dispute of material fact.[23]

Furthermore, to the extent that Plaintiffs rest the "subjected to criminal charges on

---

[23] Paragraph 145 of the PSOF cites to Hinchey's deposition for the proposition that "Hinchey told her supervisors and the prosecutor that Defendant Veach would be able to testify to PPD policies and the veracity and accuracy of the information presented in the PPD spreadsheet." (PSOF ¶ 145 (citing PSOF at Ex. 18, pp. 151–52, 158–60, 525–26)).

However, pages 151 through 153 of Hinchey's deposition relate to a "prosecutorial decision" to call Veach to testify about PPD policies at the second grand jury (*id.* at 151–53); Veach is entitled to absolute immunity for her grand jury testimony. *See Rehberg*, 132 S. Ct. at 1499.

Pages 158 through 160 of Hinchey's deposition merely confirm the undisputed fact that, acting as PPD's liaison, Veach answered Hinchey's questions regarding PPD policies and procedures. (PSOF at Ex. 18, pp. 158–60). However, Hinchey also confirms that she independently reviewed the relevant PPD policies. (*Id.* at 161).

Pages 525 through 526 of Hinchey's deposition merely attest that "[w]hen [Hinchey] was provided with . . . [the PSB] spreadsheet, [she] was under the impression that [Veach] would testify to the veracity of the data on this spreadsheet . . . for trial purposes." (*Id.* at 525–26). Hinchey's "impression," however, is irrelevant. Moreover, Hinchey clarifies that "Veach said she and another officer had collected the data," but did not tell Hinchey that Veach "had reviewed the underlying data in the spreadsheet to verify its accuracy." (*Id.* at 527–31).

Paragraphs 146 and 147 of the PSOF merely reiterate the undisputed fact that Veach informed Hinchey and the AGO multiple times that the PSB spreadsheet was flawed and inaccurate. (PSOF ¶¶ 146–47).

the basis of" element of their deliberate-fabrication-of-evidence claim on Veach allegedly telling Hinchey false information during Hinchey's investigation, the evidence in the record does not support such allegations. First, citing solely to Hinchey's deposition testimony, Plaintiff claims that Veach falsely told Hinchey that the Townhomes job started and stopped at Townhomes and not the precinct. (PSOF ¶ 116 (citing PSOF at Ex. 18, p. 50)). In contrast, Veach denies ever determining the start location of the Townhomes job, let alone telling Hinchey it started at the Townhomes. (April 17, 2013 Deposition of Paula Veach, PSOF at Ex. 5, pp. 51–52, 244–45, 310–12; July 22, 2013 Deposition of Paula Veach, PSOF at Ex. 6, pp. 114–15). This potential conflict in testimony, however, does not rise to the level of a genuine dispute over fact (as an issue of credibility) because in the deposition material that Plaintiff does not cite, Hinchey quickly backpedals. (PSOF at Ex. 18, pp. 51–52). Immediately after stating Veach told her the Townhomes job started at the Townhomes, Hinchey backtracks that she does not remember when or how Veach told her the Townhomes start-location, and that after numerous officer interviews indicated otherwise, Hinchey never questioned or discussed the start-location with Veach. (PSOF at Ex. 18, pp. 51–52). Moreover, Hinchey's statement that Veach told her an incorrect start location is not corroborated in Hinchey's voluminous investigative reports (DSOF at Ex. 12), the emails between Veach and Hinchey (*id.* at Ex. 13), and the transcript of a meeting between Veach, Hinchey, and the prosecutor (*id.* at Ex. 14). Thus, even if Veach had misstated the Townhomes start-location, the misstatement cannot be considered material because Hinchey clearly did not rely on it. Consequently, the Court finds that the evidence of record does not demonstrate a genuine issue of material fact that Veach subjected Plaintiffs to criminal charges by relaying false evidence related to the start-location of the Townhomes job.

Second, Plaintiffs claim Veach failed to communicate exculpatory information to Hinchey and the AGO concerning the start and stop location of the Townhomes job and Veach's personal experiences with unreliable MDT data and flex time. (Doc. 296 at 9; PSOF ¶ 131). However, Veach's personal experiences are irrelevant because there is no

1    information suggesting they were consistent with those of Plaintiff officers.  Furthermore,

2    Plaintiffs admit that Hinchey had independent access to all of this potentially exculpatory

3    information via her interviews with 21 Townhomes officers.  (Doc. 294 at ¶¶ 213–26,

4    228; s*ee* PSOF at Exs. 19–20, 23–41).  Because Veach has no constitutional duty to

5    provide exculpatory information that is reasonably available by other means, *California*

6    *v. Trombetta*, 467 U.S. 479, 488–89 (1984), the Court finds that the evidence of record

7    does not demonstrate a genuine issue of material fact that Veach subjected Plaintiffs to

8    criminal charges by withholding exculpatory evidence from Veach.

9         In sum, Plaintiffs have not demonstrated a genuine dispute of material fact that

10   Veach subjected Plaintiffs to criminal charges on the basis of false evidence.[24]

11   Consequently, Plaintiffs cannot demonstrate a constitutional violation and Veach is

12   entitled to qualified immunity and summary judgment on Counts I and II.  Accordingly,

13   the Court grants Veach's motion for summary judgment with respect to Count I and II.

14                    **2.      Count III: § 1983—Malicious Prosecution**

15        Veach argues that because her conduct did not cause the charges against Plaintiffs

16   to be filed, Plaintiffs cannot meet an essential element of their malicious prosecution

17   claim.  In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff "must

18   show that the defendants prosecuted her with malice and without probable cause, and that

19   they did so for the purpose of denying her equal protection or another specific

20   constitutional right."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

21   Malicious prosecution actions are not limited to suits against prosecutors but may be

22   brought against other persons who have wrongfully caused the charges to be filed.

23   *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002) (holding

24   that a § 1983 malicious prosecution claim against a coroner could proceed).

25                 Ordinarily, the decision to file a criminal complaint is
                 presumed to result from an independent determination on the
26                 part of the prosecutor, and thus, precludes liability for those

27   _____

28   [24] Because the Court finds that Plaintiffs cannot meet the "subjected to" element,
     the Court does not consider Plaintiffs' remaining arguments regarding *Devereaux*'s two-
     pronged test for the "deliberately fabricated" element (Doc. 296 at 7–11, 13–14).

who participated in the investigation or filed a report that resulted in the initiation of proceedings. *Smiddy v. Varney*, 665 F.2d 261, 266–68 (9th Cir. 1981). However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings. *See Galbraith*, 307 F.3d at 1126–27 (holding that plaintiff's allegations that a coroner's knowingly or recklessly false statements led to his arrest and prosecution were sufficient to state a § 1983 claim).

*Awadby v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).

Here, Plaintiffs argue that Veach, a city police officer, caused the charges against Plaintiffs to be filed by the state AGO prosecutor because Veach "knowingly provided documents to the AGO that contained 'misinformation . . . that was actively instrumental in causing the initiation of legal proceedings.' " (Doc. 296 at 15 (ellipsis in original)(quoting *Galbraith*, 307 F.3d at 1126–27)). Plaintiffs, however, do not point to evidence in the record demonstrating that Veach's conduct was "instrumental" to the initiation of the prosecution of Plaintiffs.

First, the evidence in the record demonstrates that Veach's investigation, itself, could not have been the basis for the criminal prosecution of Plaintiffs. Critically, it is undisputed that Veach "conducted an administrative investigation not a criminal investigation. Veach's job was to determine if officers working the Townhomes off-duty job violated [PPD] policies." (DSOF ¶ 29 (citing DSOF at Ex. 3 ¶ 13, Ex. 14 524:9–17); PCSOF ¶ 29 (admitting same)). During her administrative investigation, Veach created the "PSB spreadsheet" by modifying a spreadsheet containing MDT data for the Townhomes officers by adding additional sources of shift sign-in/sign-out data and various other data. (PSOF ¶ 75; DCSOF ¶ 75). It is undisputed that Veach's administrative investigation was suspended before Veach reached any conclusions (DSOF ¶ 30; PCSOF ¶ 30) and that Veach provided her investigatory materials, including the PSB spreadsheet, to Hinchey so that Hinchey could initiate a criminal investigation of Plaintiffs (PSOF ¶¶ 81, 84; DCSOF ¶¶ 81, 84 (admitting same)). However, Plaintiffs

admit that the investigative materials provided to Hinchey, including the PSB spreadsheet, were insufficient to establish probable cause that Plaintiffs had committed a crime (and therefore could not have led to charges being filed):

> Hinchey cannot explain why the PPD's year-long administrative investigation provided probable cause for prosecuting the Plaintiff Officers, particularly when that investigation had not reached any conclusions. The very reason the AGO was given the investigation was because the PPD's investigation was administrative and there was not yet a basis for a criminal prosecution. Moreover, the AGO and Defendant Hinchey had a duty to conduct an independent investigation, and thus could not simply rely on the PPD's (nonexistent) finding regarding probable cause.

(Plaintiffs' Response to Hinchey's Motion for Summary Judgment, Doc. 291 at 29 (internal citations omitted)).

Second, the evidence in the record demonstrates that Hinchey and the AGO, in fact, conducted an independent criminal investigation into Plaintiffs. The AGO was aware that Veach's investigation was incomplete and "Veach provided ongoing reminders of this fact." (PSOF ¶ 100; DCSOF ¶ 100). Although the PSB spreadsheet that Veach provided to Hinchey was indisputably incomplete (and perhaps even misleadingly so) (PSOF ¶¶ 85, 96–97; DCSOF ¶¶ 85, 96–97), Veach informed "Hinchey that the PSB spreadsheet was incomplete and contained errors" "[p]rior to the AGO's decision to seek criminal charges against Plaintiffs." (PSOF ¶ 99; DCSOF ¶ 99). Moreover, over the course of her three-year criminal investigation, Hinchey modified the PSB spreadsheet to such a degree that Plaintiffs admit that "Hinchey did not simply rely on the figures on the PSB Spreadsheet: her calculations differed widely from those on the PSB Spreadsheet." (Doc. 291 at 25 n.163). It is also undisputed that "prior to the decision to seek criminal charges," Hinchey "asked PPD for all supporting data used to calculate times in the PSB spreadsheet" (PSOF ¶ 108), determined shift start and end times using "MDT, radio log off, PACE time, [and] report entry times" (PSOF at Ex. 18, pp. 55–57), reinterviewed a Townhomes witness (PSOF ¶ 112, Ex. 44), and interviewed at least 21 involved officers (PSOF at Exs. 19–20, 23–41). Furthermore, Plaintiffs cite to

no evidence disputing the instant prosecutor's testimony that, before initiating criminal proceedings, he reviewed Hinchey's three-year investigation and determined that Hinchey "has done her own work in terms of—assessing the sources independently to come to her own conclusions beyond what was provided to her by [Veach]." (Oct. 23, 2013 Deposition of Todd Lawson, Vol. II, Doc. 318, Ex. 2 at 117:22–118:6). Indeed, the only evidence of record Plaintiff cites as demonstrating a dispute over the independence of the AGO's investigation is evidence that serves only to confirm the undisputed fact that Veach, as PPD's liaison to the AGO, communicated with Hinchey during the course of the investigation.  (DSOF ¶ 31; PCSOF ¶ 31 (citing PSOF ¶¶ 101–07); *see* PCSOF ¶¶ 34–36; DSOF ¶¶ 34–36).

Third, the evidence in the record does not support Plaintiffs' vague allegations that Veach's communications to Hinchey during Hinchey's investigation was instrumental to the filing of criminal charges against Plaintiffs.  It is undisputed that Veach met with Hinchey during the investigation to discuss the MDT and other data used in the PSB spreadsheet and background information concerning PPD's policies and procedures. (DSOF ¶¶ 34–36; PCSOF ¶¶ 34–36; PSOF ¶¶ 104–06; DCSOF ¶¶ 104–06).   To the extent that Plaintiffs argue that Hinchey and the AGO relied on Veach's alleged misrepresentations regarding the reliability of the data used in the PSB spreadsheet (*see* PCSOF ¶ 31), Hinchey's investigative reports demonstrate that Veach discussed potential limitations of the data (DSOF at Ex. 12 p.5; *see id.* at Ex. 12).  Similarly, because the "PPD policies relevant to this investigation were available online, in their entirety, for [Hinchey's] review" (PCSOF ¶ 34) and Hinchey testified that she independently reviewed the PPD policies (PSOF at Ex. 18 p. 161), the record does not support Plaintiffs claim that Hinchey and the AGO relied on Veach's representations of PPD policy.

Moreover, Hinchey and Veach both testified that Veach communicated with Hinchey professionally in the role of PPD liaison so that Veach could provide the background information and sources of data that Hinchey's investigation required; Veach did not discuss probable cause or the initiation of criminal charges.  (DSOF ¶ 36;

PCSOF ¶ 36; April 17, 2013 Deposition of Paula Veach, DSOF at Ex. 5 pp. 315:20–316:17, 319:3–25; Feb. 7, 2013 Deposition of Margaret Hinchey, DSOF at Ex. 11 pp. 158:1–160:11).  The evidence in the record, including Hinchey's investigative reports (DSOF at Ex. 12), emails between Veach and Hinchey (*id.* at Ex. 13), and the transcript of a meeting between Veach, Hinchey, and the prosecutor (*id.* at Ex. 14), corroborate Veach and Hinchey's testimony.

In Response, Plaintiffs do not cite any contradictory evidence.  (Doc. 296 at 15–17).  Instead, Plaintiffs argue that because "[n]one of [the evidence] purport[s] to delimit the substance of [Veach's] communications," Veach "may have touched upon probable cause and criminal charges; and absolutely nothing in [the evidence] forecloses this possibility."  (Doc. 296 at 16).  Plaintiffs continue that the cited evidence "could only support [Veach's] assertion through inference, but as the summary judgment movant, she is not entitled to such favor."  (*Id.* (citation omitted)).  Plaintiffs apparently misunderstand their burden at the summary judgment stage.  Because Veach has pointed out to the Court that Plaintiffs will be unable to establish a genuine dispute over material fact that Veach's conduct was instrumental in initiating the prosecution, Plaintiffs bear the burden of establishing the existence of material fact.  *Celotex*, 477 U.S. at 322–23.  Consequently, Plaintiffs' bare assertion of "metaphysical doubt as to the material facts" does not establish "a genuine issue for trial."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87.

Fourth, and finally, Plaintiffs repeatedly and strenuously admit that the basis of the criminal charges against Plaintiffs was the evidence allegedly deliberately fabricated by Hinchey.  Plaintiffs admit that:

- "The AGO obtained indictments and charges of theft against the Plaintiff Officers based on an amalgamation of false evidence that was deliberately fabricated by Defendant Hinchey."  (Doc. 291 at 10).

- "It is . . . indisputable that Defendant Hinchey's Agent Reports, which were riddled with false evidence and the false calculations, were the basis for criminal

charges of theft against the Plaintiff Officers as the figure from her calculations was the precise amount the Plaintiff Officers were charged with." (*Id.* at 10 n. 66 (citing PSOF Ex. 76)).

- "Hinchey manipulated the math, robbed the Plaintiff Officers of hours of time for each shift, and sold her false evidence and conclusions to the AGO prosecutors." (*Id.* at 11)

In sum, the evidence in the record simply does not support Plaintiffs' contention that the materials produced during Veach's administrative investigation, incomplete and lacking conclusions regarding potential criminal culpability, which were then heavily modified by Hinchey during the AGO's three-year independent investigation such that the materials differed wildly from Veach's original materials, were somehow instrumental in the filing of criminal charges against Plaintiffs.  Indeed, the Court agrees with Plaintiffs that concluding "Veach and the PPD are to blame for [Hinchey's] false calculations and false statements about PPD policies . . . is contrary to the clear evidence" in the record.  (Doc. 291 at 25 n.3 (citing *id.* at Part I.d. and the dozens of citations to the record contained within)).  Because Plaintiffs have not demonstrated a genuine dispute over material fact that Veach caused the charges against Plaintiffs to be filed (an element of malicious prosecution), Plaintiffs cannot demonstrate a constitutional violation. Therefore, Veach is entitled to qualified immunity and summary judgment on Count III. Accordingly, the Court grants Veach's motion for summary judgment with respect to Count III.

### 3.     Count V: § 1983—Violations of *Garrity*-Protected Rights

Veach argues that the evidence in the record does not, and Plaintiffs cannot, show that Veach violated Plaintiffs' *Garrity* rights.  (Doc. 257 at 10–12).  Here, Plaintiffs admit that the only plaintiff[25] to have provided *Garrity*-protected information to Veach was Plaintiff Sywarungsymun.   (DSOF ¶¶ 39–40; PCSOF ¶¶ 39–40 (admitting same)).

---

[25] As explained above, *supra* Part II.B.2.b.1., Plaintiffs have no constitutional right related to Contreras' *Garrity*-protected information.

1    Plaintiffs also admit that they "cannot show that Defendant Veach's conduct involving
2    Plaintiffs' *Garrity* rights resulted in a constitutional violation" and "failed to disclose any
3    evidence to support their allegations that the information obtained during the interview
4    with Plaintiff Sywarungsymun was used in the subsequent criminal investigation."
5    (DSOF ¶¶ 38, 42; PCSOF ¶¶ 38, 42 (admitting same); *see also* DSOF ¶¶ 39–41, 44;
6    PCSOF ¶¶ 39–41, 44 (admitting same)).

7        Plaintiffs make no arguments,[26] and the Court finds none, as to how the record
8    evidences a genuine dispute of material fact that Veach violated Plaintiffs' *Garrity* rights.
9    Because Plaintiffs cannot demonstrate a constitutional violation, Veach is entitled to
10   qualified immunity and summary judgment on Count V.  Accordingly, the Court grants
11   Veach's motion for summary judgment with respect to Count V.

12          **4.**    **Count VI: § 1983—Conspiracy to Violate Constitutional Rights**

13       Initially, as with regard to Defendant Hinchey, *supra* Part II.B.2.a.2.b., the Court
14   construes Count VI as alleging that Veach conspired with Hinchey and the prosecutor "to
15   present false evidence or evidence with a reckless disregard for the truth" to the grand
16   jury "in order to obtain a criminal indictment under false pretenses."  (Doc. 180 at ¶ 373;
17   *see id.* ¶¶ 371–72, 375–77, 380, 382–83).  Consequently, Veach is entitled to absolute
18   immunity with regard to the allegations in Count VI.

19       The Court notes, however, that because Veach did not testify before the grand jury
20   (unlike Hinchey), Count VI contains a single factual allegation (Doc. 180 ¶ 374) that, if
21   taken alone and out of context, may attempt to allege a conspiracy between Veach and
22   Hinchey (and not the prosecutor or others) related solely to Hinchey's investigation.[27]  To

---

24       [26] Indeed, in their Response, Plaintiffs make no mention of Count V.  (*See*
25   Doc. 296).

26       [27] Plaintiffs allege that

27           [d]uring the time period when the investigation was
        purportedly being conducted by the AGO, Defendants
        Hinchey and Veach had multiple conversations during which
28           they discussed evidence that was either fabricated or
        presented with reckless disregard for the truth, and

1   the extent that Count VI can be construed as based on investigatory, rather than

2   testimonial, conduct, Veach cannot be entitled to absolute immunity and the Court must

3   analyze the claim through the lens of qualified immunity.

4       A conspiracy claim brought under § 1983 requires proof of " 'an agreement or

5   meeting of the minds to violate constitutional rights,' " *Franklin v. Fox*, 312 F.3d 423,

6   441 (9th Cir. 2001) (quoting *United Steel Workers of Am. v. Phelps Dodge Corp.*,

7   865 F.2d 1539, 1540–41 (9th Cir. 1989) (citation omitted)), and an actual deprivation of

8   constitutional rights, *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting

9   *Woodrum v. Woodward Cnty., Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989)). " 'To be

10   liable, each participant in the conspiracy need not know the exact details of the plan, but

11   each participant must at least share the common objective of the conspiracy.' " *Franklin*,

12   312 F.3d at 441 (quoting *United Steel Workers*, 865 F.2d at 1541).

13       Here, Veach argues that Plaintiffs have failed to adduce evidence of a "meeting of

14   the minds" between Veach and Hinchey and that no predicate constitutional violation

15   occurred.  (Doc. 257 at 12–14; Doc. 318 at 2–3).  Plaintiffs scantly respond that "[t]here

16   is ample factual evidence to show that Defendant Veach worked with Defendant Hinchey

17   during the course of [Hinchey's] investigation (and fabrications)."  (Doc. 296 at 17

18   (citing PSOF ¶ 83)).  It is not in dispute that Hinchey consulted Veach and Veach assisted

19   Hinchey during Hinchey's investigation.  (DSOF ¶ 21; PCSOF ¶ 21; PSOF ¶ 83;

20   DCSOF ¶ 83).  However, proof that Veach assisted Hinchey is *not* proof of "an

21   agreement or meeting of the minds to violate constitutional rights."  *Franklin*,

22   312 F.3d 441 (quotation omitted).  Because Plaintiffs proffer only conclusory allegations,

23   not evidence (Doc. 296 at 17; *see* Doc. 180 at ¶ 374), Plaintiffs fail to demonstrate a

24   genuine issue of material fact that Veach and Hinchey agreed and acted to violate

25

26           Defendants Hinchey and Veach agreed to utilize false
27       evidence or evidence presented with a reckless disregard for
         the truth to mislead the AGO prosecutor into pursuing
28       criminal charges against Plaintiff Officers.

    (Doc. 180 ¶ 374).

1   Plaintiffs' constitutional rights.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

2   ("A summary judgment motion cannot be defeated by relying solely on conclusory

3   allegations unsupported by factual data.").  Consequently, Plaintiffs cannot demonstrate a

4   constitutional violation[28] and Veach is entitled to qualified immunity and summary

5   judgment on Count VI.  Accordingly, the Court grants Veach's motion for summary

6   judgment with respect to Count VI.

7                    **c.    Analysis of Plaintiffs' Arizona State Law Claims**

8          Plaintiffs' SAC (Doc. 180) contains three claims against Veach pursuant to

9   Arizona state law: Counts III (Malicious Prosecution), VII (Negligence and Gross

10  Negligence), and IX (Intentional Infliction of Emotional Distress).  Veach argues that if

11  the Court dismisses all of Plaintiffs' federal claims, the Court "may properly decline to

12  exercise supplemental jurisdiction over the remaining state law claims."  (Doc. 257 at 15

13  (citing 28 U.S.C. §1367(c)(3); *Notrica v. Bd. of Sup'rs of Cnty. of San Diego*,

14  925 F.2d 1211, 1213–14 (9th Cir. 1991))).  The District Court may refuse to exercise

15  supplemental jurisdiction over state law claims once all the federal claims are dismissed.

16  *Brown v. Lucky Stores*, 246 F.3d 1182, 1189 (9th Cir. 2001) (citing

17  28 U.S.C. § 1367(c)(3) (a district court "may decline to exercise supplemental

18  jurisdiction over a claim" if "the district court has dismissed all claims over which it has

19  original jurisdiction"); *Voigt v. Savell*, 70 F.3d 1552, 1565 (9th Cir.1995)).  Further, the

20  Court's discretion is informed by the underlying values of economy, convenience,

21  fairness, and comity.  *See, e.g.*, *Exec. Software N. Am., Inc. v. U.S. Dist. Court for C.*

22  *Dist. Cali.*, 24 F.3d 1545, 1557 (9th Cir. 1994), *overruled on other grounds by Cali.*

23  *Dep't of Water Res. v. Powerex Corp*, 533 F.3d 1087 (9th Cir. 2008).

24          Here, Veach argues that she has

25                    already exhausted considerable monetary resources by
                      defending numerous depositions and responding to
26

27          [28] Moreover, because the Court finds Veach is entitled to Summary Judgment on
    the other four § 1983 claims (Counts I, II, II, and V), Plaintiffs cannot demonstrate that
28  the conspiracy resulted in an "actual violation of constitutional rights."  *Hart*, 450 F.3d at
    1071.

1
2
3

> voluminous discovery. Defendants are entitled to qualified immunity and their burden of litigating this matter should end here. The interests of justice and good stewardship of municipal resources weigh in favor of dismissing Plaintiffs' state tort claims.

4
5

(Doc. 257 at 15–16). Because Plaintiffs ignore Veach's request in their Response (*see* Doc. 296), the Court finds that Plaintiffs do not disagree with Veach on this point.

6
7
8
9
10

The Court has dismissed all claims against Veach for which it has original jurisdiction. Additionally, the Court finds that the values of economy, convenience, fairness, and comity weigh in favor of Veach. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Veach and dismisses Counts VII and IX.

11

### 2.      Plaintiffs' Claims Against the City of Phoenix

12
13
14
15
16
17
18
19
20
21
22
23
24

Plaintiffs' SAC (Doc. 180) contains seven claims against the City of Phoenix: Counts III, IV, V, VI, VII, VIII, and IX.[29]   The City of Phoenix argues that Plaintiffs' claims against it are predicated on a finding that Veach violated Plaintiffs' constitutional rights. (Doc. 257 at 15). The City of Phoenix further argues that because Plaintiffs' cannot show their constitutional rights were violated, the City of Phoenix is entitled to summary judgment. (*Id.*). Plaintiffs submit a twelve word response: "[i]f the Court denies Veach's motion—the City's argument is baseless." (Doc. 296 at 17). The inescapable implication of Plaintiffs' Response is that if the Court *grants* Veach's motion, then the City of Phoenix's motion for summary judgment is meritorious. The Court agrees with Plaintiffs, *grants* Veach's motion to dismiss, *supra* Part III.D.1., and therefore finds the City of Phoenix's argument meritorious. Accordingly, the Court grants the City of Phoenix's Motion for Summary Judgment (Doc. 257) with respect to Counts III, IV, V, VI, VII, VIII, and IX.

25
26
27
28

---

[29] Counts IV, V, VI, VII, and VIII directly name the City of Phoenix as a defendant. Counts III and IX indirectly name the City of Phoenix as a defendant because they name Veach in her official capacity as a City of Phoenix employee.

E.      **Plaintiffs' Cross-Motion for Partial Summary Judgment Against Veach on Counts I and II of the SAC (Doc. 293)**

Because the Court grants Veach's Motion for Summary Judgment (Doc. 257) with respect to Counts I and II of the SAC, Plaintiffs' Cross-Motion for Partial Summary Judgment Against Veach on Counts I and II of the SAC (Doc. 293) is moot. Accordingly, the Court denies Plaintiffs' motion as moot.

## IV.     CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Hinchey's Motion to Dismiss (Doc. 197) is GRANTED.

**IT IS FURTHER ORDERED** that Defendants Veach and the City of Phoenix's Motion for Summary Judgment Regarding Immunity (Doc. 257) is GRANTED.  Thus, Defendant Veach is granted immunity on Counts I, II, III (federal), V, and VI.  Because the Court declines in its discretion to retain supplemental jurisdiction over the state law claims, Counts III (state), VII, VIII, and IX against Defendants Veach and the City of Phoenix are dismissed without prejudice.

**IT IS FURTHER ORDERED** that Hinchey's Motion for Summary Judgment on Qualified Immunity Grounds (Doc. 213) and Plaintiffs' Cross-Motions for Partial Summary Judgment against Defendants Hinchey and Veach on Counts I and II of the SAC (Docs. 291, 293) are DENIED as moot without prejudice.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

1      **IT IS FINALLY ORDERED** that because this Order resolves all remaining

2    Claims against all remaining Defendants, the Clerk of the Court shall enter Judgment for

3    the remaining Defendants on Counts I, II, III, IV, V, VI, VII, VIII, IX, and XIII.  The

4    Judgment shall reflect that Counts III (state), VII, VIII, and IX against Defendants Veach

5    and the City of Phoenix are dismissed without prejudice, consistent with this Order.

6      Dated this 14th day of March, 2014.

James A. Teilborg
Senior United States District Judge