# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Peck, et al., | No. CV-12-01371-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| Margaret Hinchey, et al., | |
| Defendants. | |

Pending before the Court is Defendant's Motion for Summary Judgment on Qualified Immunity Grounds (Doc. 375). The Court now rules on the motion.[1]

**I.   Background**

On March 14, 2014, the Court issued an Order on Defendants' motion to dismiss and the parties' cross motions for Summary Judgment. (Doc. 329). On July 15, 2016, this Court received the decision of the U.S. Court of Appeals for the Ninth Circuit affirming this Court's decision in part, and reversing and remanding in part. (Doc 351-2). Following the Court of Appeals' decision, this Court issued an Order to clarify the

---

[1] At oral argument, Plaintiffs raised for the first time that Defendant improperly filed a Response to Plaintiffs' Additional Controverting Facts ("RSOF") (Doc. 387), which Defendant cited in her Reply brief (Doc. 386). Plaintiff did move for any formal relief based on this issue (e.g., Plaintiff did not ask the Court to strike it). Plaintiff is correct that District of Arizona Local Rule Civil 56.1 does not contemplate a RSOF. *See* LRCiv 56.1(a), (b); *see also GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 3068638, at *1 (D. Ariz. June 1, 2016) ("Local Rule 56.1 does not provide for a reply statement of facts or a response to the non-moving party's separate statement of facts"). The Court has reviewed the facts therein and finds that no new, material facts were raised for the first time in Defendant's RSOF. Therefore, the Court will not take any action on this procedural issue.

procedural posture of this case. (Doc. 352). Plaintiffs maintain three counts against Defendant Hinchey under the Civil Rights Act of 1871, 42 U.S.C. § 1983. (*Id.*). No other defendants or claims remain in this case. (*Id.*).

Defendant responded to those counts by filing a Motion to Dismiss (Doc. 355), which was denied by this Court (Doc. 368). Defendant later filed a Motion for Summary Judgment on Qualified Immunity Grounds on February 2, 2017 (Doc. 375). Plaintiffs filed a Response on March 6, 2017 (Doc. 379). Defendant then filed a Reply on March 21, 2017 (Doc. 386).

Count I, Intentional Presentation of False Evidence to Support Criminal, Count II, Presentation of False Evidence to Support Criminal Charges with a Reckless Disregard for the Truth, and Count III, Malicious Prosecution, are discussed below.[2]

### A. Undisputed Material Facts

Steven Peck, Benjamin Sywarungsymun, Aaron Lentz, and Shannon Lentz (hereinafter "Plaintiffs") filed a complaint in June 2012 against several defendants, including Margaret Hinchey (hereinafter "Defendant"). (*See* Doc. 1, *as am.* Doc. 180). Plaintiffs—except for Shannon Lentz[3]—are officers in the Phoenix Police Department ("PPD") who were investigated for falsely reporting their hours worked at a uniformed, off-duty security job coordinated by former PPD Officer George Contreras at Cotton Center Townhomes (the "Job"). (Doc. 380 at 2). Defendant was a Special Agent with the Arizona Attorney General's Office during the course of the investigation. (Doc. 380 at 3).

The Court went through the background facts regarding Defendant's investigation

---

[2] Count III initially included both a federal §1983 claim and an Arizona state law claim for malicious prosecution, but the state law claim in Count III was dismissed, along with Plaintiffs' other state law claims, for failure to comply with Arizona's Notice of Claim Statute. (Doc. 329 at 24). The Court of Appeals' mandate, reversing this Court's decision to grant summary judgment in favor of Defendant on Count III on absolute immunity grounds, pertained only to the § 1983 claim. (Doc 351-2 at 4). The Court of Appeals declined to reverse this Court's decision on the dismissal of state law claims, which stands. The claims in Plaintiffs' Second Amended Complaint, that were remanded by the Court of Appeals, represent the "totality of the claims" remaining in this case. (Doc. 352 at 3).

[3] Shannon Lentz is the spouse of Aaron Lentz. (Doc. 380 at 2).

of Plaintiffs' conduct at the Job in its previous Summary Judgment Order, so the Court will not repeat them all here (Doc. 329 at 2-5). Facts most relevant to this Order are discussed below and the Court will discuss other relevant facts as necessary:

> Contreras selected more than fifty PPD officers to work this off-duty job, including Plaintiffs Steven Peck, Aaron Lentz, and Benjamin Sywarungsymun ("Plaintiffs"). (PSOF ¶ 1). The Townhomes officers worked in two-man shifts and used a patrol car that was picked-up and dropped-off at the PPD South Mountain Precinct. (PSOF ¶¶ 21–27). Contreras kept a handwritten logbook at the South Mountain Precinct to allow officers to log their activities and communicate relevant information to subsequent shifts. (PSOF ¶¶ 35–37).
>
> Contreras did not monitor or verify the times that the officers began and ended their shifts. However, the patrol cars used by the officers included an on-board computer ("MDT") that recorded officers' sign-in/sign-off times. (PSOF ¶ 47; Controverting Statement of Facts to Defendants City of Phoenix and Paula Veach's Separate Statement of Facts in Support of Her Motion for Summary Judgment on Immunity Grounds ("PCSOF"), Doc. 297 ¶ 5). Although the MDT's sign-in/sign-off system could be unreliable, the officers often used the MDT. (PSOF ¶ 55–59; see PCSOF ¶ 5). Additionally, the officers used radios that recorded on/off times. (PSOF ¶ 52; see PCSOF ¶ 5). PPD off-duty policies, however, did not require the officers to sign-in with the MDT at the beginning of their shifts, or to sign-off the MDT or the radio at the end of their shifts. (PSOF ¶¶ 48–52).
>
> In October, 2006, the Townhomes job ended. (PSOF ¶ 68). On December 7, 2006, in response to a citizen complaint that the Townhomes officers had been paid for services not actually performed, PPD assigned two detectives from its Professional Standards Bureau to audit the Townhomes job. (Defendants City of Phoenix, Paula Veach and Jack Harris's Statement of Facts in Support of Motion for Summary Judgment Regarding Immunity ("DSOF"), Doc. 258 ¶¶ 1–4; PCSOF ¶¶ 1–4). The detectives gathered documentation including pay slips, department reports from arrests made at the Townhomes, sign-in/sign-off data from the MDTs, radio on/off times, and various written logs. (PCSOF ¶ 5). The detectives organized this information into an Excel

spreadsheet (the "PSB spreadsheet") and the preliminary data indicated discrepancies between the hours officers worked and the hours they were paid. (PCSOF ¶¶ 6–7).

PPD transferred the matter to Sergeant Paula Veach to conduct an administrative investigation to determine if any PPD policies had been violated. (PCSOF ¶¶ 8–10). Veach received the PSB spreadsheet, requested additional materials, and added additional information to the PSB spreadsheet. (PCSOF ¶¶ 11–12). Veach also conducted seven Garrity-protected officer interviews, including of Contreras and Plaintiff Sywarungsymun. (PCSOF ¶¶ 14–16).

After two of the interviewed officers admitted to leaving the Townhomes job early, Veach was ordered to create a PowerPoint presentation to show the current status of her ongoing administrative investigation to her chain of command. (PCSOF ¶¶ 17–18). Following the presentation, Veach was ordered to halt her administrative investigation and PPD referred the matter to the Arizona Attorney General's Office ("AGO") for an independent criminal investigation. (PCSOF ¶¶ 19–20). Veach was ordered to provide her records to the AGO and serve as PPD's liaison for the purposes of the AGO's criminal investigation. (PCSOF ¶ 20).

In November 2008, the AGO appointed Special Agent Margaret Hinchey to conduct a criminal investigation into the matter and Hinchey contacted Veach. (PCSOF ¶ 21). Veach met with Hinchey to discuss the PSB spreadsheet and its underlying data. (DCSOF ¶ 21). Veach informed Hinchey that Veach's administrative investigation was incomplete and that the PSB spreadsheet was incomplete and inaccurate. (PCSOF ¶¶ 22, 99–100). During the course of Hinchey's investigation, Veach, as the PPD liaison, answered Hinchey's questions related to PPD policies and procedures and directed Hinchey to sources of data relevant to Hinchey's investigation. (PCSOF ¶ 34). In December 2009, Veach was transferred out of the PSB unit and her role as PPD liaison to Hinchey ended. (PCSOF ¶ 23).

During Hinchey's investigation, Hinchey "asked PPD for all supporting data used to calculate times in the PSB spreadsheet" (PSOF ¶ 108), determined shift start and end

times using "MDT, radio log off, PACE time, [and] report entry times" (PSOF at Ex. 18 pp. 55–57), reinterviewed a Townhomes witness (PSOF ¶ 112, Ex. 44), and interviewed at least 21 Townhomes officers (PSOF at Exs. 19–20, 23–41). As part of her investigation, Hinchey heavily modified the PSB spreadsheet. (*Id*.; see also SSOF at Exs. 17, 58–60). During her investigation, Hinchey authored numerous investigative reports (DSOF at Ex. 12) and informed her supervisors of the status of her investigation. Plaintiffs allege that Hinchey's reports failed to include exculpatory evidence and included false or fabricated evidence intended to mislead the prosecutor into pursuing criminal charges against Plaintiffs. (SAC ¶¶ 232–37).

Plaintiffs allege that the decision to indict Plaintiffs was made in the fall of 2010. (SAC ¶ 241). Specifically, Plaintiffs allege that, in order to achieve political gain, Attorney General Terry Goddard directed that Hinchey's investigation conclude and the prosecutor procure indictments prior to Election Day on November 2. (SAC ¶¶ 244–47). Plaintiffs further allege that in response, Hinchey presented false, misleading, and fabricated results from her investigation to the prosecutor, Todd Lawson, for the purposes of supporting criminal charges against Plaintiffs. (SAC ¶¶ 251–54, 260–61). Plaintiffs allege that Lawson convened a grand jury and Hinchey, as the sole witness to the grand jury, perjuriously presented false evidence to secure an indictment against Plaintiffs. (SAC ¶¶ 255–57). The grand jury returned an indictment of Plaintiffs on November 17, 2010. (SAC ¶ 258). Plaintiffs allege that there was no probable cause for the indictment. (SAC ¶ 259). Plaintiffs further allege that Hinchey continued the investigation and continued to submit false, fabricated, and misleading reports to her supervisors and Lawson. (SAC ¶ 268).

During the course of criminal discovery, Plaintiffs' attorneys reviewed Hinchey's investigation, discovered falsities, and moved for remand of Plaintiffs' indictment. (SAC ¶¶ 278–80). Remand was granted and a second grand jury was empaneled, but the second grand jury failed to return an indictment of Plaintiffs. (SAC ¶ 281–84). Plaintiffs allege that without the false evidence, the second grand jury could not find probable cause. (SAC ¶ 283). On November 23, 2011, all

criminal charges against Plaintiffs were dropped. (SAC ¶ 286).

(Doc. 329 at 2-5).

## II. Summary Judgement Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id*. 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to

create a material issue of fact and defeat a motion for summary judgment. *Id*. at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.2004).

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no genuine issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. (citations omitted).

### III. Qualified Immunity

Defendant argues that she is entitled to qualified immunity as a matter of law on all outstanding counts because she reasonably—even if erroneously—believed that her conduct in investigating Plaintiffs did not violate Plaintiffs' constitutional rights. (Doc. 375 at 14). The qualified immunity doctrine "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

#### A. Legal Standard

Section 1983 provides a private right of action against individuals acting under color of state law who violate others' constitutional or statutory rights. 42 U.S.C. § 1983. Qualified immunity, however, shields government officials from civil liability under § 1983 when applicable. Qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Defendant is entitled to qualified immunity if her conduct did not violate a clearly established constitutional right "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 801 (1982). "Courts should decide issues of qualified immunity as early in the proceedings as possible, but when the answer

depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury." *Bryant v. City of Goodyear*, No. CV-12-00319-PHX-JAT, 2014 WL 2048013, at *3 (D. Ariz. May 19, 2014) (quoting *Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998)).

The United States Supreme Court has set forth a two-step test—comprised of the "constitutional inquiry" and the "qualified immunity inquiry"—to determine if a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The "constitutional inquiry" examines whether the alleged facts, as viewed in the light most favorable to the non-moving party, demonstrate that a defendant's conduct violated one of a plaintiff's constitutional rights. *Id.* If the alleged facts show that a right was violated, the Court must then address the "qualified immunity inquiry" to determine whether the right was "clearly established." *Id.* at 201–02. A government investigator is not entitled to qualified immunity for her conduct if "it would be clear to a reasonable [investigator] that the conduct was unlawful in the situation [s]he confronted." *Id*. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The qualified immunity inquiry "must be undertaken in [the] light of the specific context of the case, not as a broad general proposition." *Id.* at 201.

### B.    Counts I and II: *Devereaux* Claims

Counts I and II (the "*Devereaux* claims") allege that Defendant violated Plaintiffs' right to be free from criminal charges based on "false evidence that was deliberately fabricated by the government." (*See* Doc. 379 at 8-9).[4] "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). A claim that a government agent deliberately

---

[4] The Court discusses both the fabrication and reckless claims together because both Parties comingle the claims in their briefs. (Doc. 375 at 14-20; Doc. 379 at 9-22). Furthermore, deliberate fabrication is "equivalent" to recklessness for the purposes of the instant qualified immunity inquiry. (Doc. 329 at 30 n.22).

- 8 -

fabricated evidence must be supported by evidence that either: "(1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012) (quoting *Devereaux*, 263. F.3d at 1076).

Plaintiffs argue that Defendant violated both of the *Devereaux* prongs. (*See* Doc. 379 at 10). To support this argument, Plaintiffs allege that Defendant relied on incomplete or unreliable investigatory sources, failed to verify claims from those sources, failed to disclose potentially exculpatory evidence, generated false reports as to the extent of her investigation, and ignored or misunderstood pertinent information about Plaintiffs' timekeeping systems. (*Id*. at 10-11). Plaintiffs also point out that, at the motion to dismiss stage, this Court acknowledged that Plaintiffs' complaint provided sufficient allegations to support those claims, if true. (*See id*. at 9; *see also* Doc. 368 at 7).[5] The facts of this case when construed in the light most favorable to Plaintiffs, however, do not validate Plaintiffs' assertions.

### 1. Officers Admitted to Leaving Shifts Early

Defendant may have exaggerated theft claims based on misunderstandings of the evidence and failed to diligently pursue all possible leads that could have improved the quality of her investigatory findings, but a careless or inaccurate investigation does not necessarily reach the level of a constitutional violation. *See Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) (holding that an investigator's carelessness or inaccuracy "does not satisfy *Devereaux's* stringent test"). The record demonstrates that Defendant's

---

[5] Plaintiffs misapply the "law of the case" doctrine by arguing that this Court's analysis under the motion to dismiss standard must result in the same outcomes at the summary judgment stage (Doc. 379 at 10). The "denial of motions to dismiss do not constitute law of the case for the purpose of summary judgment." *Moonin v. Nevada ex rel. Dep't of Pub. Safety Highway Patrol*, No. 3:12-CV-000353-LRH, 2015 WL 4113289, at *6 (D. Nev. July 8, 2015) (citations omitted); *see also Robbins v. Wilkie*, 433 F.3d 755, 764 (10th Cir.2006) ("Law of the case does not apply because a motion to dismiss and a motion for summary judgment do not raise the same issues.").

interviews with officers who worked the Job revealed that several officers did in fact admit to leaving the Job early. (*Compare* Doc. 379 at 16 n.120-21 (citing Doc. 380 at ¶¶ 31.2, 48, 53) *with* Doc. 375 at 15-16).[6] George Contreras, the Job's coordinator, was among those who admitted to leaving early and working suspect shifts with Plaintiffs. (*Compare* Doc. 379 at 16 (citing Doc. 380 at ¶¶ 48.1, 53, 58, 76) *with* Doc. 375 at 15; *see also* Doc. 376-2 at 96). Defendant was told that the practice of leaving the Job early, but receiving full pay was "pretty common" among officers. (*See* Doc. 375 at 16 (citing Doc. 376-2 at 238, 241)). While Defendant could have acted in a more diligent manner to investigate these witness statements, nothing in the statements would provide actual or constructive knowledge to Defendant that Plaintiffs were in fact innocent of the charges against them, and Defendant did not fabricate or coerce these witness statements. (*Compare* Doc. 379 at 16 *with* Doc. 375 at 16-17). These undisputed admissions instead provide evidence that Defendant reasonably relied upon in furtherance of her investigation into Plaintiffs.

### 2. Defendant's Determination of Shift Start Times

Plaintiffs take particular issue with Defendant's methodology in estimating shift start times in constructing timelines of shifts worked by Plaintiffs. (*See* Doc. 379 at 11-12). However, Plaintiffs decided not to provide Defendant with potentially exculpatory evidence of their innocence relating to start times during Defendant's investigation. (*Compare* Doc. 379 at 16 *with* Doc. 375 at 16). As a result, Defendant was left to rely on what proved to be unreliable data sources, such as MDT timestamps, to construct a timeline and narrative that tended to indicate that Plaintiffs were not innocent. (*See* Doc. 379 at 13). In calculating the length of each officer's shift, Plaintiffs allege that Defendant "deliberately fabricated evidence related to start time" by operating under the

---

[6] For Lieutenant Tortoricci, *see* Doc. 376-2 at 238-39; for Officer Hoenigman, *see* Doc. 380-4 at 17-18; for Officer Reiff, *see* Doc. 376-2 at 104-05; for Officer Thompson, *see* Doc. 380-5 at 80; for Officer Holton *see* 380-5 at 221-22, 226. While some of these officers did provide explanations for their premature departures—often that they were simply following orders from Contreras, the Job's coordinator, when working alongside him—those explanations do not negate their admissions, which provided credible evidence of theft to Defendant. Defendant did not falsify statements to this effect.

- 10 -

assumption that the Job's client understood shifts to starts when officers were on the property, but "clearly the agreement was that the shift would start when the officers arrived at the South Mountain precinct." (*See* Doc. 379 at 11; *see also* (Doc. 380-2 at 37, 244:16-245:4) (Veach testified in her deposition that she did not tell Defendant whether officers started the Job for timekeeping purposes at the station or at the property)).

While Defendant may have operated under a mistaken impression, this did not distort time calculations to the point where a reasonable investigator would have thought Plaintiffs to be innocent because Defendant did credit some travel time at the beginning and end of each shift and relied on multiple data sources to calculate shift times (*See* Doc. 386 at 7 (citing Doc. 380-16 at 31, 27:24-28:25) for credit of travel time; *see e.g.,* Doc. 376 at 10-11 for use of multiple data sources). Plaintiffs concede that Defendant accounted for preparation time on some shifts, but question whether she did so all shifts. (*See* Doc. 379 at 12). But again, this goes to Defendant's methodology in how she came to her conclusions and does not demonstrate that Defendant deliberately fabricated evidence. (*Compare id.* at 12-13 *with* Doc. 386 at 7). By alleging that the preparation time Defendant failed to account for "could be an additional 21 minutes" per shift, Plaintiffs cast doubt on whether Defendant misstated the amount of time for which Plaintiffs were paid while not working at the Job, but this correction would not provide Defendant notice that Plaintiffs were innocent; only that the amount of their theft was being exaggerated. (*See* Doc 379 at 12). In other words, the time discrepancies were well over 21 minutes per shift. (*See* Doc. 375 at 2 (citing Doc. 376 at ¶¶ 9); *see also* Doc. 376-3 at 3).

### 3. Defendant's Reliance on MDT Timestamps

Plaintiffs next allege that Defendant deliberately reported a false theft amount by "rel[ying] on unreliable and incomplete sources in her investigation" because Defendant used MDT timestamps as the primary data source in determining shift start and end times. (*Id.* at 12). Plaintiffs provide the same assertions to question the methodology in using this data source, but Defendant relied on multiple data sources during her

investigation. (*Compare* Doc. 379 at 11-12 *with* Doc. 386 at 7). While the accuracy of Defendant's findings may be in question, Defendant did not deliberately fabricate evidence by using an unreliable source without knowledge of its falsity. (*Compare* Doc. 379 at 12-13 *with* Doc. 386 at 7-8).

If anything, overreliance on MDT timestamps that did not capture work before and after MDT sign-in and sign-off contributed to an overestimation of the shorted shifts that exaggerated the amount of Plaintiffs' alleged theft. (*Compare* Doc. 379 at 13 *with* Doc. 386 at 9). Defendant could have exercised more diligence in determining whether MDT timestamps were the best data source upon which to base her findings because questions were raised about its reliability during Defendant's investigation, but mere reliance on that data source did not provide Defendant with actual or constructive knowledge of Plaintiffs' innocence. (*Compare* Doc. 379 at 14 *with* Doc. 386 at 7; *see also* (Doc. 380-2 at 58, 326:15-327:11) (Veach testified that she thought MDT sign-in and sign-off time would not be reliable markers for calculating how long each officer actually worked, but did not recall sharing this opinion with Defendant)). The same is true with Plaintiff's alleged failure to account for "flex time" in her reports based on her understanding of witness statements. (*Compare* Doc. 379 at 17-18 *with* Doc. 386 at 6-7).

Investigators may "draw on their own inferences from and deductions about the cumulative information available to them," as Defendant did here. *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008) *(*quoting *United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir.2002)). Defendant may be wrong in her inferences and deductions without violating a clearly established constitutional right. *See Devereaux*, 263 F.3d at 1076-77 (Reasoning that an investigator cannot permissibly intentionally fabricate evidence, but need not "carry out an investigation in a manner that will ensure an error-free result"). There is no constitutional due process right to "have the investigation carried out in a particular way" or using a particular methodology. *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003). Defendant's conclusions based on MDT timestamps proved inaccurate, but inaccurate conclusions based even on a dubious methodology do

not violate either *Devereaux* prong. *See Gausvik*, 345 F.3d at 817.

### 4. Defendant did not Deliberately Fabricate Witness Statements

Next, Plaintiffs allege that Defendant deliberately fabricated false witness statements with respect to the reliability of MDT data and admissions by officers that they left early. (Doc. 379 at 15-16). Plaintiffs claim that Defendant said that MDT timestamps would definitely measure officer shift start and stop times, but Lawson, the prosecutor, was in fact responsible for promoting that misconception. (Doc. 386 at 9 (citing Doc. 380-16 at 57, 177:24-178:13)). That is not the only statement made by Lawson that Plaintiffs mistakenly credit to Defendant in support of their *Devereaux* claims. (*See* Doc. 379 at 13, *but see* Doc. 386 at 9 (asserting that Lawson's statements regarding PPD policy on the use of MDTs and that Officer Lentz was short on every shift were deliberated fabricated by Defendant without providing any evidence that Lawson relied on Defendant for those assertions)).

In its Notice of Supplemental Authority (Doc. 392), Plaintiffs call the Court's attention to *Spencer v. Peters*, which provides that Plaintiffs do not need to meet *Devereaux's* two-prong test if Plaintiffs provide "direct evidence of fabrication" by way of deliberately fabricated witness statements (857 F.3d 789, 798-99 (9th Cir. 2017); *accord Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)). To this end, Plaintiffs allege that Defendant did just that by "deliberately falsely report[ing]" that officers fully admitted leaving early, but Plaintiffs do acknowledge that officers "admitted to leaving early." (Doc. 379 at 15); *see supra* Part III.B.1. An investigative report need not be perfect because the Ninth Circuit explained in *Spencer* that "[t]o be sure, not all inaccuracies in an investigative report give rise to a constitutional claim." 857 F.3d at 789 (citations omitted).

Here, Defendant's interpretation of officers' statements is reasonable under the circumstances and does not rise to the high standard of deliberately fabricated evidence. Defendant did not manufacture any officer's words, but understood them to be full admissions of leaving early even though some officers provided excuses or potential

justification for their conduct. (*See* Doc. 379 at 6 n.37-38). "Mere 'careless[ness]' is insufficient, as are mistakes of 'tone'" to prove direct fabrication by an investigator who mischaracterizes a witness statement. *Spencer*, 857 F.3d at 798. Even if Defendant mischaracterized officer's statements by claiming that they "fully admitted" to leaving early when most of those officers offered a caveat to their admission, this is, at worst, akin to a mistake in tone. (*See* Doc. 379 at 6 n.37-38). The Court finds that there is no direct evidence of fabrication herein, therefore, Plaintiffs must satisfy the *Devereaux* test to advance their deliberate fabrication claims.

### 5. Defendant's Investigative Techniques

Plaintiffs further allege that Defendant disregarded or failed to ascertain "potentially exculpatory evidence" provided by officers as to various timekeeping processes. (*Id*. at 16). Even if true, "[a] police officer's failure to preserve or collect potential exculpatory evidence does not violate the Due Process Clause unless the officer acted in bad faith." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (holding that a police officer was entitled to qualified immunity even though he failed to document multiple interrogations, did not keep a record of statements denying a criminal suspect's wrongdoing, and failed to gather physical evidence that could have exonerated the suspect). Rather, a plaintiff must "put forward specific, nonconclusory factual allegations that establish improper motive" to prove that an investigator acted in bad faith by failing to pursue all potentially exculpatory evidence. *Id*. (citing *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001)). Plaintiffs do not offer such evidence here. For example, Defendant failed to recall that she interviewed Officer Thiebaut because that interview was not transcribed. (*Compare* Doc. 380 at 54 *with* Doc. 375 at 18). However, that failure was clearly due to an administrative error by administrative staff and Plaintiffs offer no evidence of bad faith. (*See* Doc. 375 at 18).

### 6. Defendant did not Deliberately Fabricate Additional Evidence

Finally, Plaintiffs argue that Defendant fabricated additional evidence by "rel[ying] on unreliable and incomplete sources in her investigation," including the PSB

spreadsheet. (Doc. 379 at 19). The PSB spreadsheet was a compilation of preliminary data adduced by Veach in the PPD's Professional Standard Bureau, which indicated that there were discrepancies between the hours that officers worked and the hours for which officers were paid at the Job. *See supra* Part I.A at 3-4. Veach provided the PSB spreadsheet and a companion PowerPoint presentation regarding that status of the investigation to Defendant when this investigation was referred to the AGO. *See id.* at 4. These documents specifically identified Plaintiffs as being involved in potential theft by getting paid for more hours than they worked at the Job and included an estimated dollar amount of alleged theft. (*See* Doc. 376-2 at 29-91). Veach testified in her deposition that her documentation was "incomplete … and that there was other data available." (Doc. 380-2 at 35, 232:19-21). Plaintiffs allege that Defendant did not "verify the information she received" from Veach, which led to her inaccurate conclusions. (Doc. 379 at 19).

While the extent to which Defendant relied on this incomplete documentation is in dispute, Defendant did undisputedly review some additional sources of evidence during the course of the investigation. Plaintiffs concede that "[Defendant] reviewed multiple data sources and PPD policies" and that Defendant specifically "attempted to review and analyze all data provided to her for every shift Plaintiff Officers worked at the Job" (Doc. 380 at 63-64, ¶¶ 74-75) (internal quotations omitted). For example, in analyzing Plaintiff Officer Sywarungsymun's shift on March 24, 2016, Defendant reviewed several documents related to the shift in addition to MDT timestamps, including: the "log" identifying when the shift was supposed to start and end, "The [PPD] Code Enforcement Unit Off-Duty Query Results," the "Off-Duty Officer Job Log," the "[PPD] Dispatched/Call Back Calls for Service Grid," the handwritten "Daily Log," the "Patrol Recap Unit History Worksheet," the "Off-Duty Vehicle Log," and various financial records and general practices in constructing a timeline of when Officer Sywarungsymun actually worked at the Job during day. (*Compare* Doc. 376 at 10-11, ¶¶ 77 *with* Doc. 380 at 66, ¶¶ 77).[7]

---

[7] Plaintiffs dispute that Defendant reviewed arrest records for the Job, which she

Plaintiffs contend that Defendant failed to gather or ignored other sources of evidence to clarify Job timelines, which resulted in inaccurate findings. (Doc. 379 at 19). For instance, Defendant reviewed portable radio deactivation data for some shifts, but did not request that data for many more shifts. (*See, e.g.*, Doc. 380 at 10, ¶¶ 18.4.1). To the extent that Defendant did over-rely on the PSB spreadsheet from Veach, Defendant was basing her investigation on a record that was known to be "flawed" and contained "errors." (Doc. 380-2 at 40-41, 257:2-13; 258:4-9). Veach, however, did not identify what those errors might be, except that she had did not fix all the potential typos in the document and the math within the spreadsheet was not entirely accurate. (*Id*. at 40-41, 257:2-13; 258:4-9; *Id*. at 44, 271:19-24). Veach did not share that any specific items or data points in her spreadsheet were false; only that the dollar amounts of potential theft per officer were estimates. (*Id*. at 98, 164:9-16).

Even so, Defendant is not constitutionally required to conduct a reasonably thorough, diligent, or even competent investigation. *See Malley*, 475 U.S. at 341. Defendant did rely on, or offer as true, any specific data points that she knew to be false in the PSB spreadsheet because Veach did not point out any and had not yet reached any conclusions about her data by the time she turned it over to Defendant. (*See* Doc. 380-2 at 25:3-15). Defendant undoubtedly could have exercised additional due diligence to ascertain the validity of timestamps and other data she did rely on, but that is not the standard under *Devereaux*. *See Devereaux*, 263 F.3d at 1076-77. When viewed in the light most favorable to Plaintiffs, the evidence in the record cited by Plaintiffs only demonstrates that Defendant relied on data from an incomplete administrative investigation that was "flawed" and contained careless or inaccurate representations of the facts. (*See* Doc. 329 at 31-32). A careless or inaccurate investigation that does not ensure an error-free result does not rise to the level of a constitutional violation. *See*

---

claimed to have reviewed generally and specifically for this shift; nevertheless, Plaintiffs concede that Defendant reviewed several different data sources during her investigation and did not rely exclusively on the PSB spreadsheet and PowerPoint. (Doc. 380 at 66, ¶¶ 77).

*Gausvik*, 345 F.3d at 817.

### 7. Conclusion as to the *Devereaux* Claims

While viewing all disputed facts in the light most favorable to the Plaintiffs, the evidence fails to support a finding that Defendant's conduct violated either of the *Devereaux* prongs. Defendant seemingly relied on incomplete data at times and failed to conduct a conclusively thorough investigation of Plaintiffs, which resulted in inaccurate findings. (Doc. 379 at 7). However, this level of carelessness in conducting a less than thorough investigation fails to meet the standard set by *Devereaux* to remove the protection of qualified immunity for deliberately fabricating evidence. *See Gausvik*, 345 F.3d at 817. There is no disputed issue of fact that indicates Defendant knew or should have known that Plaintiffs were innocent during her investigation. Defendant's investigative shortcomings are not "so coercive and abusive" that Defendant knew or should have known that those techniques would yield false information, even though the investigation was faulty. *Devereaux*, 263. F.3d at 1076.[8] Accordingly, Defendant is entitled to qualified immunity on the *Devereaux* claims.

### C. Count III: Malicious Prosecution

Defendant also argues that she is entitled to qualified immunity on Count III, malicious prosecution. A malicious prosecution claim brought under § 1983, requires proof that defendant "prosecuted [Plaintiffs] with malice and without probable cause, for the purpose of denying [them] equal protection" under the Constitution. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).

Although Defendant is an investigator, not a prosecutor, actions for malicious prosecution are not limited to prosecutors; such an action may be brought against those who wrongfully caused charges to be filed. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002) (holding that a malicious prosecution claim brought under

---

[8] Additionally, Plaintiffs do not allege and point to no evidence that Defendant's interview techniques were abusive or coercive, so the Court need not address that issue. (Doc. 379 at 21).

- 17 -

§ 1983 could proceed against a coroner).

> Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings . . . However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings. *See Galbraith*, 307 F.3d at 1126–27 (holding that plaintiff's allegations that a coroner's knowingly or recklessly false statements led to his arrest and prosecution were sufficient to state a § 1983 claim).

*Awabdy*, 368 F.3d at 1067 (citing *Smiddy v. Varney*, 665 F.2d 261, 266–68 (9th Cir. 1981), *overruled on different grounds by Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008)).

Here, Plaintiffs have a malicious prosecution claim available against Defendant if Defendant's false reports induced Lawson to file criminal charges against Plaintiffs without probable cause. (Doc. 379 at 22).

### 1. Probable Cause

Plaintiffs argue that probable cause was lacking to prosecute Plaintiffs. *See id*. Plaintiffs further allege that Defendant was "actively instrumental in causing the initiation of legal proceedings" against Plaintiffs. (Doc. 379 at 21-22 (citing *Lacy v. Cty. of Maricopa,* 631 F. Supp. 2d 1197, 1210 (D. Ariz. 2008) (citing *Awabdy,* 368 F.3d at 1066)). Plaintiffs were initially indicted after Defendant presented her investigatory findings as the sole witness to the grand jury. *See supra* Part I.A at 5. After the errors in Defendant's investigation were brought to light during criminal discovery, a new grand jury was empaneled and decided not to return an indictment against Plaintiffs. (*See* Doc. 379 at 22-23). Plaintiffs allege that this shows there was no probable cause to indict Plaintiffs due to the removal of faulty information provided by Defendant from the legal proceeding. *See id*. at 23. While viewing all disputed facts in the light most favorable to

1 the Plaintiffs, the evidence can support a finding that Defendant caused Plaintiffs to be prosecuted without probable cause.

Even if probable cause was lacking, Plaintiffs must show that Defendant "reasonably believed in good faith that probable cause" did not exist. *Smiddy*, 665 F.2d at 266. By finding that Defendant did not deliberately fabricate evidence in violation of *Devereaux*, this Court determined that Defendant did not continue her investigation despite the fact that she knew or should have known that Plaintiffs were innocent. *See supra* III.B.7 at 17. But Defendant's reasonable belief that Plaintiffs were not innocent is a lower standard than belief that there was probable cause. Even if Defendant should have known that probable cause did not exist to prosecute Plaintiffs, Plaintiffs' argument fails to satisfy the additional elements for malicious prosecution addressed below.

### 2. Malice

Defendant argues that there is no evidence of malice because Plaintiffs did not allege that Defendant's conduct was undertaken for the purpose of violating Plaintiffs' constitutional rights. (Doc. 375 at 21). Plaintiffs argue that "a reasonable jury could also infer malice and intent to deprive [Plaintiffs] of constitutional rights" if Plaintiff deliberately fabricate false evidence. (Doc. 379 at 23 (citing *Lacy*, 631 F. Supp. 2d at 1211)). While this is true, the Court found that Defendant did not deliberately fabricate false evidence. *See supra* III.B.7 at 17. Plaintiffs offer no evidence to support a finding that Defendant's otherwise careless reliance on incomplete evidence and failure to conduct a more thorough investigation was motivated by bad faith or the purpose of denying Plaintiffs equal protection. *Awabdy,* 368 F.3d at 1067. Accordingly, the Court cannot infer malice and Defendant is entitled to qualified immunity on the malicious prosecution claim.

///
///
///
///

## IV. Conclusion

For the reasons outlined above,

**IT IS ORDERED** that Defendant Hinchey's Motion for Summary Judgment on Qualified Immunity Grounds on February 2, 2017 (Doc. 375) is GRANTED. Thus, Defendant Hinchey is granted immunity on Counts I, II, and III. Because these are the only claims remaining against the only remaining Defendant, the Clerk of Court shall enter judgment in favor of Defendant Hinchey and against Plaintiffs and shall close this case.

Dated this 7th day of July, 2017.

James A. Teilborg
Senior United States District Judge